Makram A. **TADROS**, Plaintiff,

v.

D. Jackson **COLEMAN** and the Cornell University Medical College, Defendants.

No. 88 Civ. 4431 (RPP).

United States District Court,
S.D. New York.

June 22, 1989.

Opinion on Motion for Reargument
Aug. 15, 1989.

---

Makram A. Tadros, New York City, pro se.

Walter J. Relihan, Jr., University Counsel, Cornell University, Ithaca, N.Y. by Thomas Mead Santoro, Associate Universi-

ty Counsel (Theodore L. Araujo, on the briefs), for defendants; Haight, Gardner, Poor & Havens, New York City, of counsel.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Makram A. Tadros, proceeding pro se, brought this suit alleging federal causes of action for violations of Title VII of the Civil Rights Act of 1964 and section sixteen of the Civil Rights Act of 1870, and pendent state causes of action for breach of contract and fraud.[1] The Cornell University Medical College and D. Jackson Coleman, chairman of its ophthalmology department, answered with eleven separate affirmative defenses and have now moved for summary judgment under Fed.R.Civ.P. 56. One week after oral argument on the defendants' motion, Dr. Tadros moved to amend his complaint. For the reasons following, the plaintiff's motion is denied, the defendants' motion is granted, and this lawsuit is hereby dismissed.

### Background

Makram Armanios "Mark" Tadros was born in 1928 in Abu Kerkas Minia, Egypt. The Kasr El Aini Faculty of Medicine of Fouad First University (now Cairo University) awarded him diplomas in 1950, 1953, 1954, 1955, and 1958. Cornell University was founded in 1865 in Ithaca, New York. Its Medical College stands high above the East River on Manhattan's York Avenue. Dr. D. Jackson Coleman is the John Milton McLean Professor of Ophthalmology at the Cornell University Medical College and chairman of the school's ophthalmology department. What follows is this action's tortuous chronology.

Shortly before the fall of 1983, Dr. Tadros, unsolicited, approached Cornell about joining the Medical College faculty. He submitted the necessary papers on September 23, 1983, writing "none" in the space next to "salary." In a letter dated October 12, 1983, to Dr. Thomas H. Meikle, Jr., Dean of the Medical College, Dr. Coleman recommended that Dr. Tadros be designated a Visiting Lecturer in Ophthalmology. On October 20, Dr. Meikle approved, and Cornell appointed Dr. Tadros to a nine month term as a Visiting Lecturer in Ophthalmology, effective retroactively from October 1, 1983. The college renewed the appointment for a year on July 1, 1984.

Dr. Tadros's appointment to the courtesy faculty gave him access to the Medical College's library. As Dr. Tadros himself admits, however, during the pendency of his appointment he received no salary, no health or dental benefits, no insurance or retirement benefits, no office space, no secretarial help, and no regularly assigned work hours.[2] Notwithstanding his title, moreover, Dr. Tadros never delivered a single lecture to any students.[3]

---

**1.** Although pro se litigants should be held to "less stringent standards than those governing lawyers," *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir.1989), it bears noting that Dr. Tadros retained three different law firms during the events summed up in this opinion, and as recounted below, enjoyed the benefit of counsel when he filed his first EEOC complaint against Cornell, when he signed the form relinquishing that claim, when he filed his second EEOC complaint against Cornell, when he asked for and received a Notice of Right to Sue letter, and, after the Court advised him several times to retain a lawyer, *e.g.*, Order of Feb. 22, 1989, when he prepared to respond to and argue against Cornell's motion. Later, Dr. Tadros wrote, "That he is unlucky to find the proper counsel does'nt [sic] exclude his constant searching and securing legal advice." "Completion of plaintiff's oral argument" at 12 (May 17, 1989). *Cf. Baldwin County Welcome Center v.*

*Brown*, 466 U.S. 147 & 150 n. 4, 104 S.Ct. 1723 & 1725 n. 4, 80 L.Ed.2d 196 (1984) (per curiam).

**2.** *Cf.* Transcript of oral argument at 15 (May 11, 1989):

The Court: Did [Dr. Coleman] require you to come into work on a regular basis?

Dr. Tadros: Yes, your Honor. Usually on Thursday. Two kinds of commitments. Grand round was each Thursday from 4 to 6. So I go there about 3:30 or early in the morning because he is busy at that time to see with him the cases of the meetings....

**3.** In his June 24, 1986 EEOC complaint, Dr. Tadros wrote, "For the past several years, my lectures have always been very satisfactory." Whatever he meant to imply to the contrary, though, Dr. Tadros has never contested Cornell's allegation that he has never delivered a single lecture *at Cornell.*

During those twenty-one months, from October 1983 to June 1985, Dr. Tadros, uninvited, attended some of the department's grand rounds. Cornell did not list him on the typed sign-in sheets, so Dr. Tadros inserted his own name. He also began planning what he called "Cornell Clinical Symposia." An advertisement for the first of them, scheduled for May 10, 1984 and entitled "Viscosurgery; Pearls and Pitfalls," appeared in at least one ophthalmologic journal; and the unverified "Meeting Announcements" section of the March 15, 1985 issue of *Ophthalmology Times* carried listings for two more. Dr. Tadros received numerous requests for more information. The record leaves unclear whether any of the scheduled symposia actually took place.[4]

On April 11, 1985, as Dr. Tadros's courtesy appointment neared its end, Dr. Coleman told Dr. Tadros in a letter that Cornell would not be renewing his library privileges.[5] On June 3, 1985, Dr. Tadros filed complaints with the Equal Employment Opportunity Commission (EEOC) and the New York State Division of Human Rights (DHR), alleging that Cornell had discriminated against him because of his Egyptian origin. The two sides immediately met to try to resolve things. On June 19, after consulting with his lawyers, the firm of Barry, McTiernan & Moore, Dr. Tadros signed a general release in which he agreed to discharge Cornell from all suits based on "his appointment or cessation of appointment at Cornell University including but not limited to any claim of discrimination based upon national origin or any other basis" in return for "a one year terminal appointment as Visiting Lecturer in Ophthalmology at Cornell University Medical College to commence on July 1, 1985 and expire the next following June 30." Dr. Coleman confirmed the agreement by letter. Dr. Tadros then withdrew his EEOC complaint, "in view of its amicable settlement," by letter dated June 21. He did not withdraw his DHR complaint. On June 27, Denise Kaiser, Administrator of the Office of Faculty Affairs, wrote a letter "to whomever it may concern" stating that Dr. Tadros "was appointed Visiting Lecturer in Ophthalmology effective October 1, 1983 and his appointment is confirmed until June 30, 1986." The letter was stamped "Not to Be Reappointed."

On July 11, 1985 Dr. Tadros sent Dr. Coleman a letter headed "Re: A Prospectus for 1985–86; M. Tadros." In the letter Dr. Tadros proposed to "properly orient all med. students to the indispensable role of funduscopy, pupils and other ocular signs in systemic disease" by delivering "Didactic lectures and tuition" in "Ophthalmology basics" and the "Inter-relation of Ophthalmology and other disciplines"; to "achieve a comprehensive Residency Training Program" by lecturing on "External diseases" and "Psycho–Ophthalmology"; to "establish Cornell as 'Mecca' for Ophthalmic 'Pilgrimage'" by "further efforts to rejuvenate Grand Rounds in line with successful

---

**4.** Of the twenty-eight people who wrote the letters Dr. Tadros submitted as exhibit C in this motion, twenty-four merely asked for information (two wrote twice, and one wrote four times) and three refused invitations to speak. No one accepted an invitation to speak, and no one mentioned attending an actual session. *Cf.* Transcript of oral argument at 15 (May 11, 1989) ("Dr. Tadros: And I have letters of appreciation, all these from all over the country. From Texas to California to Fort Worth all over the country.").

One doctor wrote,
May I add my compliments to the many that you have received for conducting the important course on Ophthalmic Iatrogenic Problems. Now that thirty-nine states permit optometrists to use diagnostic drugs, plaintiff's attorneys will find a new field to add to the heavy burden of medical care for the American people.
The letter was dated July 25, 1984. The lecture on "Ophthalmic Iatrogenic Problems" was planned for November 8, 1984—three and a half months later.

**5.** Dr. Coleman's letter did not detail the reasons for the college's decision, but in his June 3, 1985 EEOC complaint Dr. Tadros gave his version:
I was terminated for an unproven claim made by Kenneth Tardiff, MD, Associate Dean for students[,] concerning an unidentifiable [sic] student.... Dr. Tardiff considered a casual talk, five months after a misunderstanding; as a complaint of "inappropriate behavior". Another frivolous allegation of "attending a medical meeting["] was added to justify their ungrounded decision.

'Cornell Clinical Symposia'"; and to "re-integrate the widely diverging, splitting subspecialities; in strives [sic] towards better management of disease" by founding "Interdisciplinary Symposia," "since 'Nature' has shown disrespect for the artificial separation of indivisible entities." Dr. Coleman replied in a letter dated August 14, 1985: "Thank you for your suggestions[,] but at the present time they are not appropriate or necessary." Dr. Tadros wrote to Dr. Coleman on October 7 and again on December 14, asking him to reconsider. Finally, on March 20, 1986, Dr. Tadros wrote, "Rather than forcing me to further action; I would appreciate, as repeatedly requested before; meeting with you at your earliest convenience." Dr. Coleman did not respond.

Dr. Tadros began to take further action. Still consulting counsel, Dr. Tadros wrote to Cornell President Frank Rhodes, appealing "for due process procedure." Dr. Meikle answered on President Rhodes's behalf in a letter dated June 9, 1986, asking Dr. Tadros to follow the standard procedures for academic grievances. Dr. Tadros wrote out a "Statement of Grievance" on June 11, 1986, in which he claimed that he had signed the June 19, 1985 release under duress. Dr. Bruce Ballard, Associate Dean for Equal Opportunity Programs, met with Dr. Tadros on June 11 and 12, but told Dr. Meikle in a memorandum that informal resolution was impossible. In a letter to Dr. Tadros dated July 10, Dr. Meikle concluded that Dr. Tadros's complaint did not constitute a "grievable action"; "[s]ince the resolution of the discrimination complaint [of the year before] was in return for the one year *terminal* appointment, it cannot be

said that ... [the] failure to reappoint you constitutes retaliation for your having filed the retaliation complaint." Furthermore, Dr. Meikle wrote, there was no evidence of duress, since Dr. Tadros had talked to a lawyer before signing the release, and "several pieces of correspondence from you show a lawyer receiving copies."

Meanwhile, on June 24, 1986, Dr. Tadros filed charges with the EEOC for the second time. In his complaint he alleged that Cornell had retaliated against him for his first EEOC filing by not letting him teach and had discriminated against him by not reappointing him to his courtesy position. The EEOC deferred initial processing to the DHR, which had by then revived Dr. Tadros's earlier charge and called Cornell in for a hearing. Dr. Tadros now hired a new lawyer, Leonard Flamm of Hockert & Flamm, and Mr. Flamm wrote to Dr. Coleman on July 24, threatening him with legal action if Dr. Tadros was not reappointed. The two sides met again, that December, and Dr. Tadros and Mr. Flamm each wrote more letters to the DHR as well as at least four more letters to President Rhodes.[6] On April 30, 1987, the DHR issued a Determination and Order After Investigation dismissing the complaint for lack of jurisdiction.[7] The DHR order specifically found that

complainant was not, in fact, an employee. Respondent had provided complainant with an identification card to permit him to use respondent's technical library. Complainant performed no services of any kind for the respondent and received nothing from the respondent that could form the basis for an employer/employee relationship.

---

**6.** In one of those letters Dr. Tadros claimed that he had applied for, but had been denied, a position as an Associate Clinical Professor of Ophthalmology. The evidence he himself submitted shows that Dr. Tadros had filled out a blank "Career Statement" and typed the words "Application for 'Associate Professor', Ophth. Dept" below the form's printed heading. In any event, Dr. Tadros did not allege discrimination in hiring in either of his complaints to the EEOC, and the allegation is not properly before this Court. *Cf.* Transcript of oral argument at 29–30 (May 11, 1989) (repeating allegation that Cornell discriminated against him in hiring).

**7.** According to a memorandum to files dictated on April 21, 1987 by Armando Martinez, the DHR regional director, during the December 15, 1986 meeting Dr. Tadros repeatedly refused to answer when asked whether Cornell had ever paid him or offered him any kind of contract. Dr. Tadros then said that he had introduced Cornell to "psycho-ophthalmology." Dr. Coleman said that he had never heard of the subject and that "there [was] no possibility" of Dr. Tadros's teaching it.

Earlier that spring, Dr. Tadros had decided to appeal to a different agency. In a handwritten letter dated April 6, 1987, he asked the EEOC for a "substantive weight review" "in light of the inept handling of [his] complaint by N.Y. State with a predetermined attitude." The EEOC began its own investigation on May 21. On July 8, and again on July 27, Dr. Tadros requested a right to sue letter. An EEOC employee prepared a "Notice of Right to Sue (Issued on Request)" dated August 4, and placed it in Dr. Tadros's file. The EEOC investigator in charge of Dr. Tadros's case, Patricia Ann Hicks, meanwhile concluded that the EEOC had no jurisdiction over Dr. Tadros's case, since an "employer-employee relationship does not exist." Ms. Hicks then prepared a "Notice of Right to Sue (Dismissal)" and dated it August 6, 1987. According to her log, Ms. Hicks sent a copy of the August 6 "Notice of Right to Sue (Dismissal)" to Dr. Tadros on the same day, August 6.[8] Cornell received a copy five days later. According to Dr. Tadros, he received a copy of the August 4 "Notice of Right to Sue (Issued on Request)" on August 4, when he went to Ms. Hicks's office.[9]

For six months, Dr. Tadros, following Mr. Flamm's advice, kept silent. On February 2, 1988, Dr. Tadros went to the EEOC's office in Manhattan and examined his case's file. In a letter bearing that same date, Dr. Tadros complained that "[d]espite my earlier repeated verbal and written requests of 7/8 and 7/27/87, I have never received 'NORTS' yet. Besides, on reviewing the files today, courtesy of Ms. Hicks, after many trials, I did not come across said notice!"[10] Ms. Hicks wrote to Dr. Tadros on February 19, "enclosing a copy of your Notice of Right to Sue which you evidently inadvertently overlooked when you reviewed the file."[11] On March 14, 1988, Dr. Tadros wrote to the EEOC yet again, with a copy to his attorney, Mr. Flamm, requesting the chance "to elucidate some relevant intricacies" and stressing that "I have never received 'NORTS' " and

---

**8.** *Cf.* Affidavit in opposition to defendant's motion for summary judgment at 3 (Apr. 17, 1989) (calling EEOC log "carefully edited yet seriously flawed"); Transcript of oral argument at 46 (May 11, 1989) (calling log "flawed and absolutely influenced and made to purpose").

**9.** Dr. Tadros first divulged that information at oral argument, on May 11, *1989.*

In his affidavit, Thomas Mead Santoro, Cornell's Associate University Counsel, wrote that the EEOC told him it never provided the August 4 notice to either party. Affidavit of Thomas M. Santoro ¶ 6 (Mar. 7, 1989). That statement is hearsay, and thus the Court does not consider it in this motion for summary judgment. Fed.R. Civ.P. 56(e). *Cf.* Transcript of oral argument at 38–39 (May 11, 1989):

Dr. Tadros: On August 4, she said here we have NORTS [i.e., "Notice of Right to Sue"] on request.

The Court: How can you be so sure it was August 4?

Dr. Tadros: Because it is dated August 4. She gave it to me then. I passed in the afternoon—

The Court: What did you get August 4?

Dr. Tadros: August 4 is the date which she did it, your Honor.

The Court: How do you know that?

Dr. Tadros: Because in my notes I went there Monday after finishing my work—

The Court: Have you got your notes?

Dr. Tadros: But not with me here. Yes, your Honor.

The Court: How do you know what day it is?

Dr. Tadros: Because I am in contact with her, she states all the time August 4, 1987. This is such a situation, and I am stating Monday, so that you can verify that.

The Court: August 4 was not a Monday in August 1987.

Dr. Tadros: Not a Monday?

The Court: No.

Dr. Tadros: Tuesday perhaps?

**10.** *Cf.* Transcript of oral argument at 44–45 (May 11, 1989):

The Court: ... In his papers Mr. Santoro says that on February second you acknowledge examining the file—

Dr. Tadros: Yes. After long request, yes.

The Court: —of the EEOC.... In examining the file didn't you see that this notice—?

Dr. Tadros: No. And I wrote to—

The Court: It's right on top of it.

Dr. Tadros: I was having limited time and I ran through the file. I didn't see it. I ran through everything that's why I requested to have. ...

**11.** Mr. Santoro's affidavit offers the hearsay evidence that an EEOC paralegal examined Dr. Tadros's file after February 2 and noticed that the August 4 "Notice of Right to Sue (Issued on Request)" had disappeared. Affidavit of Thomas M. Santoro ¶ 6 (Mar. 7, 1989). That testimony cannot be considered in this motion. Fed.R. Civ.P. 56(e); *see supra* note 9.

"I hereby respectfully demand this NORTS, *issued on request*" (emphasis in original).[12] The EEOC answered Dr. Tadros yet again, and for the third time sent him a copy of the August 6 "Notice of Right to Sue (Dismissal)." In a letter dated April 29, 1988 (which the EEOC received on June 3), Dr. Tadros—still using paper on which he had typed the Cornell Medical College's address—thanked the EEOC's District Director "for all your fairness, revealed in your fine letter of 3/23/87 [sic]; albeit with the wrong 8/6/87 NORTS." Dr. Tadros's letter was headed "Re: Request of the proper 8/4 NORTS issued on Request." At the bottom of Dr. Tadros's letter he wrote "Encl: 2 NORTS!" Dr. Tadros filed his first complaint in this action on June 24, 1988. He filed an amended complaint on October 4, 1988.

## Discussion

As the Supreme Court has emphasized, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1); *cf. Donahue v. Windsor Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987) ("summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial"). In their answer, Cornell and Dr. Coleman put forth eleven affirmative defenses. At least four entitle the defendants to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989) (summary judgment appropriate when plaintiff "failed to 'designate specific facts showing there [was] a genuine issue for trial' regarding" an "essential element of [his] case") (quoting *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553).

### I. Title VII of the Civil Rights Act of 1964

Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 253 (codified as amended at 42 U.S.C. § 2000e *et seq.,*) provides, in relevant part:

It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

. . . .

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §§ 2000e–2(a)(1), 2000e–3(a).

As the statute's language makes clear, Title VII is not a legal catchall. Title VII is an *employment* law, available only to employees (or prospective employees) seeking redress for the unlawful employment practices of their employers. *See Wheeler v. Main Hurdman*, 825 F.2d 257, 275–76 (10th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987); *Spirides v. Reinhardt*, 613 F.2d 826, 829–30 (D.C. Cir.1979). It follows that unless he was Cornell's "employee" and Cornell his "employer," Dr. Tadros has no cause of action under Title VII.

### A. Was Dr. Tadros Cornell's "Employee"?

Title VII may define "employee" with "magnificent circularity," *Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir.1986) (per curiam); *see* 42 U.S.C.

---

**12.** *But cf.* Transcript of oral argument at 38–39 (May 11, 1989) (*supra* note 9) (Dr. Tadros disclosed that he received a copy of the August 4, 1987 "Notice of Right to Sue (Issued on Request)" by hand on August 4, 1987.

§ 2000e(f) ("'employee' means an individual employed by an employer"), but "[t]he word 'employee,' however broadly defined, is still 'employee,' and circumscribed by meanings reasonably related to that word," *Wheeler v. Main Hurdman, supra,* 825 F.2d at 276; *see id.* ("Drafters of [Title VII] gave no indication that they were departing from the common discourse of the republic when fashioning a law to be understood by and applied to its citizens."). If the word "employee" is to mean anything other than "person," Title VII must be limited to those who are "employed." Congress did not invite the federal courts to serve as forums for people who seek to air their resentments. It is axiomatic that a would-be plaintiff must have rendered the defendant some kind of service in order to sue under Title VII. That service, moreover, must have been one from which the putative employer willingly derived a benefit. *Cf.* 29 U.S.C. § 203(g) (in Fair Labor Standards Act, "'employ' includes to suffer or permit to work"). Title VII does not extend to officious intermeddlers.

■ In this case, there is no circumstantial and little direct evidence that Dr. Tadros did anything for Cornell or Dr. Coleman, or that Cornell or Dr. Coleman either wanted or accepted whatever Dr. Tadros may have done. His voluntary appearances at the weekly grand rounds served Dr. Tadros, not Cornell. Like a student's weekly attendance at a chemistry laboratory, they do not constitute employment. Neither is there a genuine issue of material fact concerning the "Cornell Clinical Symposia." Dr. Tadros may have done a lot of planning, but there is no evidence that any symposia in fact took place, or, assuming one did, that the event redounded to Cornell's benefit. The evidence suggests that Dr. Tadros himself created his "job" with Cornell; it does not show that Dr. Tadros did any real work for Cornell or that Cornell endorsed, even reluctantly, anything he did do. Dr. Tadros has not met the minimal jurisdictional prerequisites that Congress demands of a Title VII plaintiff.

■ Yet even assuming for the purposes of this motion that he did do work for Cornell and that Cornell did benefit from the work, Dr. Tadros is still not entitled to bring an action under Title VII. Plaintiffs who have without question rendered service to an appreciative defendant are not deemed Title VII "employees" solely by dint of their labor. What an employee is may be unclear, but courts have devised their own approaches for determining what an employee is not. According to established case law, partners are not employees and independent contractors are not employees. Given those holdings, neither are volunteers. *See, e.g., Smith v. Berks Community Television,* 657 F.Supp. 794 (E.D. Pa.1987); *see also Schoenbaum v. Orange County Center for the Performing Arts, Inc.,* 677 F.Supp. 1036 (C.D.Cal.1987); *cf. Rogers v. Schenkel,* 162 F.2d 596 (2d Cir. 1947).

This conclusion follows from the logic of the partner and independent contractor cases, and it finds support in Supreme Court cases construing the Fair Labor Standards Act, *e.g., Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). Some courts have held that there is "no indication that Congress intended the words of the statute to have anything but their ordinary meaning as commonly understood," and that "the term 'employee' in cases under Title VII is to be construed in light of general common law concepts." *Cobb v. Sun Papers, Inc.,* 673 F.2d 337, 340–41 (11th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982). *See generally* Dowd, "The Test of Employee Status: Economic Realities and Title VII," 26 *Wm. & Mary L. Rev.* 75 (1984). Two people might be contractually linked, but under common law, one person was only another's employer if she enjoyed the right to "control" his physical conduct, "not only as to the result to be achieved, but also as to the details by which that result is achieved." *Wheeler v. Main Hurdman, supra,* 825 F.2d at 270 (quoting *Spirides v. Reinhardt,* 613 F.2d at 831–32); *see* Dowd, *supra,* at 80–86 & 80 n. 20 (quoting Restatement (Second) of Agency § 220 (1958)); *Cobb v. Sun Papers,* 673 F.2d at 341–42. Other courts have exam-

ined the "economic realities" of the parties' relationship. *E.g., Lutcher v. Musicians Union Local 47,* 633 F.2d 880 (9th Cir. 1980); *see also Armbruster v. Quinn,* 711 F.2d 1332, 1339–42 & 1341 n. 7 (6th Cir. 1983); *cf. Doty v. Elias,* 733 F.2d 720, 722–23 (10th Cir.1984); Dowd, *supra,* at 112–14. Thus, a partner's "participation in profits and losses, exposure to liability, investment in the firm, partial ownership of firm assets and her voting rights" deprive her of employee status. *Wheeler v. Main Hurdman, supra,* 825 F.2d at 276; *cf. id.* at 271–75; *Hyland v. New Haven Radiology Assocs.,* 794 F.2d 793, 797 (2d Cir.1986); *see also Doty v. Elias, supra,* 733 F.2d at 722–23; *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058–59 (2d Cir.1988) (for determining employee status under Fair Labor Standards Act, the "ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves").

The better approach combines the two tests. *See, e.g., Beverley v. Douglas,* 591 F.Supp. 1321 (S.D.N.Y.1984); *Spirides v. Reinhardt, supra.* A Title VII plaintiff is only an "employee" if the defendant both pays him and controls his work. Any lower threshold would imply that "discrimination itself defines the application of [Title VII]," a theory implicit in Dr. Tadros's bringing this lawsuit, but one that the Tenth Circuit specifically rejected in *Wheeler v. Main Hurdman.* As the Tenth Circuit explained, under that theory, anyone "who can be discriminated against is, ipso facto, an employee."

> The problem with that reasoning is that it must include independent contractors and every other business relationship as well. If Congress had intended [the employment discrimination laws] to apply to the performance of all services, subject to stated exceptions, it would have said so. To suggest that Congress intended the provisions of Title VII, the ADEA, and the FLSA to reach all situations where discrimination may arise in a business setting is to suggest that it enacted these statutes with the intent that they cover all individuals having an economic

relationship with a business. This would make employee status largely irrelevant and would essentially transform the employment discrimination statutes into *business* discrimination statutes. If this were the case, then we must question why Congress bothered to limit each statute's reach to employment practices. The requirement that the statutes cover only employment situations suggests that Congress perceived a need to limit the application of these statutes.

825 F.2d at 275–76 (citation omitted; emphasis in original); *see also Hickey v. Arkla Indus., Inc.,* 699 F.2d 748, 753 (5th Cir. 1983) (similar analysis under Age Discrimination in Employment Act).

Congress has limited the employment discrimination statutes by excluding volunteers from the statutes' scope. Volunteers usually work under their supervisors' control, but they do not—by definition—get paid. Because they are not "economically dependent on the business to which [they] render[ ] service," *Doty v. Elias, supra,* 733 F.2d at 722–23, volunteers cannot invoke the remedies of Title VII. *Smith v. Berks Community Television,* 657 F.Supp. 794 (E.D.Pa.1987); *see also Schoenbaum v. Orange County Center for the Performing Arts, Inc.,* 677 F.Supp. 1036 (C.D.Cal.1987); *cf. Alcena v. Raine,* 692 F.Supp. 261, 270 (S.D.N.Y.1988) ("it is questionable whether there are any damages available under Title VII for a volunteer, nonpaying position"); *cf. also Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 299–303, 105 S.Ct. 1953, 1960–1961, 85 L.Ed.2d 278 (1985) (Fair Labor Standards Act only covers those who work "in expectation of compensation," and does not reach "[o]rdinary volunteerism").

*Beverley v. Douglas* is illustrative. Cordia Beverley had applied for, and was denied, a voluntary faculty appointment at the Cornell University Medical College and voluntary admitting privileges at the New York Hospital, Cornell's affiliate. 591 F.Supp. at 1323. She then brought a Title VII action alleging racial discrimination in employment, and the college and hospital

moved for summary judgment. Relying on *Spirides v. Reinhardt, supra,* Judge Weinfeld wrote that "[d]etermination of whether an individual is an employee for the purposes of Title VII requires an analysis of the 'economic realities' of the situation 'viewed in light of the common law principles of agency and the right of the employer to control the employee.' " *Beverley,* 591 F.Supp. at 1326 (quoting *Cobb v. Sun Papers,* 673 F.2d at 341). After reviewing the D.C. Circuit's approach in *Spirides v. Reinhardt,* Judge Weinfeld concluded that "[c]onsideration of each of the relevant factors leaves no room to doubt that the relationship between the Hospital (*and the College*) and the voluntary staff is not one of employment." *Id.* at 1327 (emphasis added);[13] *see id.* ("There is a sharp delineation in the duties, functions, and relationship to the Hospital and the college of each of" the "full-time attending staff, who have a concomitant status as full-time members of the staff of the Medical College, and voluntary attending staff, who enjoy a concomitant appointment to the voluntary faculty of the Medical College"); *cf. Alcena v. Raine, supra,* 692 F.Supp. at 263 ("While [the plaintiff] was not employed by Cornell University Medical College, he was a voluntary faculty member").

Similar facts exist here. Dr. Tadros was a volunteer, and despite Dr. Tadros's hopes, both parties understood that from the outset. *See* Affidavit of D. Jackson Coleman ¶¶ 7–8 (Feb. 22, 1989); Affidavit in opposition to defendants' motion for summary judgment 4–9 (Apr. 17, 1989). Cornell bestowed no pecuniary or other benefits on him.[14] *See* Affidavit of Denise A. Kaiser ¶¶ 2–9 (Feb. 22, 1989); Transcript of oral argument at 13 (May 11, 1989); *cf.* Affidavit in opposition to defendants' motion for summary judgment 12 (Apr. 17, 1989). Neither did any of the Medical College's faculty assign Dr. Tadros any work or attempt to exercise any control over what Dr. Tadros tried to do. Coleman affidavit, *supra,* ¶¶ 6–8. In short, Dr. Tadros was not Cornell's employee. *See Smith v. Berks Community Television, supra,* 657 F.Supp. at 796; *Schoenbaum v. Orange County Center for the Performing Arts, supra,* 677 F.Supp. at 1039; *see also Miss Greater New York City Scholarship Pageant v. Miss New York State Scholarship Pageant,* 526 F.Supp. 806, 808 (S.D.N.Y. 1981); *cf. Hishon v. King & Spalding,* 467 U.S. 69, 79, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (Powell, J., concurring).

Dr. Tadros admits that Cornell never paid him and that he never did any teaching, two undisputed facts he could hardly deny.[15] In an unsworn memorandum filed after oral argument, Dr. Tadros, purporting to track "virtually all requisites enlisted in p. 1326" of *Beverley v. Douglas,* nonetheless contended that "the work was always done under the direction of a supervisor, R. Ellsworth and the control of J. Coleman," that he did work of "the most integral part of the college business," and that "high skill was required in view of subspecialization and the *ongoing progress in science, techniques, and technology."* "Completion of plaintiff's oral argument" at 1, 2 (May 17, 1989).[16] Yet Dr. Tadros also admits that Drs. Coleman and Ells-

---

**13.** *Cf.* Transcript of oral argument at 20–23 (May 11, 1989).

**14.** The value of Cornell's presence on Dr. Tadros's resume is not the type of salary or other "benefit" contemplated by Title VII. *Cf.* Dowd, *supra,* at 112–14; *cf. also Tony & Susan Alamo Foundation, supra,* 471 U.S. at 301 & n. 23, 105 S.Ct. at 1961 & n. 23.

**15.** *See* Transcript of oral argument at 13 (May 11, 1989):

  The Court: Were you paid, were you salaried?
  Dr. Tadros: No, but I have complete exercise over my work beyond any limit. And I have quotations—
  The Court: I just want to know the answer.

  Dr. Tadros: No, I was not paid.

**16.** *Cf.* Transcript of oral argument at 14–15 (May 11, 1989):

  The Court: Were you fully responsible?
  Dr. Tadros: Yes, your Honor.
  The Court: Who from?
  Dr. Tadros: The supervision of Dr. Ellsworth, who is the vice-chairman.
  The Court: How did he supervise you?
  Dr. Tadros: By constant advice. We met every day or twice a week and—
  The Court: How did he restrict you?
  Dr. Tadros: By crossing some names and adding some names and advising this is too long inappropriate—it is complete supervision. Because this is a very elaborate—

worth only advised him. In any event, Dr. Tadros's self-serving, conclusory allegations cannot defeat Cornell's motion: The evidence is not such "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see* Fed.R. Civ.P. 56 (party opposing a properly supported motion for summary judgment must raise a *"genuine* issue of material fact"); *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 925 (2d Cir.1989) (Van Graafeiland, J., dissenting) ("In response to a defendant's summary judgment motion, the plaintiff must show by affidavit or equally probative evidence the existence of specific facts creating a genuine issue for trial.... Surmise, conjecture, and conclusory allegations are not enough; [the] plaintiff must make an affirmative showing that his version of events is not fanciful."). Dr. Tadros may have tried to organize the "Cornell Clinical Symposia," but no reasonable finder of fact could determine that those efforts made him Cornell's employee.[17]

### B. *Did Dr. Tadros Meet Title VII's Time Limitations?*

■ Before he can sue in federal court, a Title VII complainant must "(i) ... fil[e] timely charges of employment discrimination with the [Equal Employment Opportunity] Commission and (ii) ... receiv[e] and act[] upon the Commission's statutory notice of the right to sue." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973). Title VII's filing requirements are similar to statutes of limitations, and a complainant's failure to meet them bars his civil action in federal court unless the defendant waives the requirements or is estopped from asserting them, or unless the limitations periods were equitably tolled. *Zipes v. Trans World Airlines, Inc.*, 455 U.S.

385, 392–398, 102 S.Ct. 1127, 1131–1135, 71 L.Ed.2d 234 (1982). Cornell argues in this motion that Dr. Tadros's action is time-barred. The Court must therefore determine whether Dr. Tadros complied with Title VII's filing requirements, and if not, whether equity should save his suit.

### 1) *Did Dr. Tadros File a Timely Charge With the EEOC?*

42 U.S.C. § 2000e–5(e) provides that

... in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... [a] charge [with the EEOC] shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under State law, whichever is earlier....

Dr. Tadros filed his New York State DHR complaint on June 3, 1985. He withdrew his first EEOC complaint on June 21, 1985. Dr. Tadros filed his second EEOC complaint, the one upon which this action is based, on June 24, 1986. In the second complaint Dr. Tadros alleged two instances of discrimination: first, that Cornell did not reappoint him to his courtesy post for the year beginning July 1, 1986, and second, that Cornell "denied [him] the opportunity to lecture to Opathalmology [sic] students" when on "August 14, 1985 I received a letter from Doctor Coleman, which clearly stated that I would not be permitted to lecture in any courses in Opthalmology [sic] for the school year."

■ Dr. Tadros admits that he knew by June 19, 1985, when he signed the general release, he would not be reappointed;

---

**17.** Dr. Tadros proffers one other argument: if Cornell really did make him a Visiting Lecturer in Ophthalmology who did no lecturing, Dr. Tadros asks, "how would'nt [sic] [Ms. Kaiser], in her official position, as director of faculty affairs, object to such abuse of Cornell's prestigious titles, to be so granted without any

duties?" Affidavit in opposition to defendants' motion for summary judgment at 4 (Apr. 17, 1989). The answer: Cornell, like other medical schools, hands out honorifics with abandon. *Cf.* Transcript of oral argument at 28–29 (May 11, 1989).

the release, after all, specifically referred to *"a one year terminal appointment ...* to commence on July 1, 1985 and expire the next following June 30." As Judge Haight wrote in *Hale v. New York State Dep't of Mental Health,* 621 F.Supp. 941 (S.D.N.Y. 1985), "[the] limitations period begins to run on the date the plaintiff receives notice of the allegedly discriminatory act, not the date the decision actually takes effect.... The timeliness of plaintiff's filing of his EEOC complaint ... must therefore be measured from the date he received definite notice of his termination, not the date of his actual discharge." *Id.* at 942 (citing *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981)); *see, e.g., Delaware State College v. Ricks,* 449 U.S. 250, 256–258, 101 S.Ct. 498, 503–504, 66 L.Ed.2d 431 (1980) (plaintiff given one year terminal contract; "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination"; "the only alleged discrimination occurred—and the filing limitations period began—at the time the tenure decision was made and communicated"); *Alcena v. Raine,* 692 F.Supp. 261, 269–70 (S.D.N.Y.1988). Dr. Tadros's claim that Cornell discriminated against him in not renewing his appointment is untimely.

█ Dr. Tadros also admits that he received Dr. Coleman's letter of August 14, 1985 on the same day. Even if the letter did constitute retaliation, Dr. Tadros can point to no further discriminatory acts that took place after that date. Cornell did not engage in a "continuing violation" of Title VII.[18] *See, e.g., Alcena v. Raine, supra; LaBeach v. Nestle Co.,* 658 F.Supp. 676, 686–88 (S.D.N.Y.1987); *Bradley v. Consolidated Edison Co. of New York,* 657 F.Supp. 197, 204 (S.D.N.Y.1987). Though he repeated his pleas for a teaching assignment as late as March 20, 1986, Dr. Tadros cannot hoist himself by his own bootstraps into the three hundred day limitations period. Dr. Tadros's claim that Cornell retaliated against him is untimely as well.[19]

### 2) *Did Dr. Tadros File a Timely Complaint in This Action?*

42 U.S.C. § 2000e–5(f)(1) provides, in relevant part:

... If a charge filed with the Commission ... is dismissed by the Commission, or if ... the Commission has not filed a civil action ... or the commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge....

Dr. Tadros filed his complaint on June 24, 1988—exactly eighty-nine days after he supposedly received "the attached Notice

18. *Cf. Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

19. Even if Dr. Tadros's retaliation claim were not time barred, he would not have succeeded on the merits.

To make out a *prima facie* case of retaliation under Title VII, [a plaintiff] must show: protected participation or opposition under Title VII known by the alleged retaliator; an employment action disadvantaging the person engaged in the protected activity; and a causal connection between the protected activity and the disadvantageous employment action.... Once a plaintiff has established his *prima facie* case, the employer must show a legitimate non discriminatory reason for the alleged mistreatment. The employee is then afforded an opportunity to prove that the employer's proffered reason is pretextual.

*DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.) (citations omitted),

*cert. denied,* — U.S. ——, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Given the undisputed fact that before the August 14, 1985 letter Dr. Tadros had never lectured to students, the decision to reject his prospectus could not have been adverse, and Dr. Tadros points to no other example of "disadvantageous" treatment. *Cf. Collins v. State of Illinois,* 830 F.2d 692, 702–04 (7th Cir.1987); *Rodriguez v. Board of Educ.,* 620 F.2d 362 (2d Cir.1980). Furthermore, "the improper motive is not causally related to the adverse action if that action would have been taken in any event in the absence of the improper reason." *Davis v. State Univ. of New York,* 802 F.2d 638, 645 (2d Cir.1986) (Newman, J., concurring). In August, 1985 Cornell accorded Dr. Tadros the same responsibilities he had always shouldered: none. It is difficult to imagine the college acting differently had Dr. Tadros not filed charges with the EEOC.

of Right to Sue letter ... on March 27, 1988."[20]

Yet the uncontested evidence shows that Dr. Tadros must have had copies of the August 6 "Notice of Right to Sue (Dismissal)" long before then. The EEOC sent him the "Notice of Right to Sue (Dismissal)" three times, and the Postal Service never sent the letters back. Dr. Tadros seems to deny receiving the "Notice of Right to Sue (Dismissal)" in August, 1987, though he leaves that ambiguous. He does not deny seeing it on February 2, 1988, when he examined his EEOC file. He does not deny receiving the "Notice of Right to Sue (Dismissal)" shortly after the EEOC sent it on February 19, 1988. (He admits he got a copy after March 23.) In light of that proof, there is no genuine issue about the fact that by late February, 1988, at the latest, Dr. Tadros had actual notice from the EEOC of his right to sue Cornell. His complaint in this action was therefore untimely.

In *Cook v. Providence Hospital,* 820 F.2d 176 (6th Cir.1987), the Sixth Circuit addressed virtually identical facts and reached the same conclusion. Unlike Dr. Tadros, however, whose statements evaded the question, Ms. Cook averred explicitly that Postal Service neglect had deprived her of her statutory notice. Confronted with a motion for summary judgment, Ms. Cook argued that she had not "received" any notice until the letter arrived in the mail. The district court rejected her argument and entered summary judgment against her. On appeal, the Sixth Circuit affirmed.

We hold that, although there may be a factual dispute about whether Cook received the letter [in the mail], the dispute does not preclude the grant of summary judgment. There is only one reasonable conclusion that can be drawn from this record. In this case, we are confronted with overwhelming evidence that Cook received notice that her claim had been administratively denied and that she had a right to sue her employer: the EEOC mailed the Notice both to Cook and to Providence. The latter received the notice; Cook's Notice was not returned undelivered; Cook admitted that in June of 1984 she talked to an EEOC employee who told her she "should have received a Right to Sue." In contrast, Cook offers only her unsubstantiated testimony that she never received the May, 1983, Notice of Right to Sue.

This dispute, moreover, is not material because whether or not Cook received the initial Notice of Right to Sue is not determinative. Assuming, *arguendo,* that Cook did not receive the Notice, she admits that she had actual knowledge, fully one year prior to suit, that the EEOC had given her the right to sue; yet, she unjustifiably failed to pursue her rights.

*Id.* at 179; *cf. id.* at 179 n. 3 ("As we recently intimated in *Hunter v. Stephenson Roofing, Inc.,* 790 F.2d 472, 475 (6th Cir.1986), there is a presumption that mail is received by the addressee and the ninety day time limit begins to run five days after the EEOC Notice of Right to Sue is mailed.").

Dr. Tadros's principal argument here is that he never got a copy of the August 4 "Notice of Right to Sue (Issued on Request)" in the mail. That much is certain, for there is no proof that the EEOC ever sent him the August 4 notice. It is also irrelevant, for the EEOC did send him the August 6 "Notice of Right to Sue (Dismissal)." Dr. Tadros is not entitled to select the EEOC disposition of his case he

---

**20.** In fact, Dr. Tadros did not attach a copy of either EEOC notice; instead, he attached the March 27 letter from Edward Mercado enclosing a copy of the August 6, 1987 "Notice of Right to Sue (Dismissal)" and telling him that the EEOC would not issue another notice. Dr. Tadros later sent the clerk's office a copy of the August 4 "Notice of Right to Sue (Issued on Request)" in response to letters from the Pro Se Office in the Southern District of New York and the chambers of Judge Sand. *Cf. Rubin v. Coughlin,* 48 Empl. Prac. Dec. (CCH) ¶ 38,487, 1988 WL 69808 (E.D.N.Y.1988). In his amended complaint, Dr. Tadros wrote that he had received the August 4, 1987 notice on March 27, 1988. At oral argument, Dr. Tadros revealed for the first time that he had actually received the August 4, 1987 notice on August 4, 1987, nearly eight months earlier.

finds most appealing. In any case, Dr. Tadros does not deny receiving the August 6 notice; and he explicitly admits that Patricia Hicks of the EEOC handed him a copy of the August 4 notice on the same day, August 4, and that he kept it and showed it to his lawyer. Transcript of oral argument at 36–43 (May 11, 1989). Dr. Tadros had copies of *both* EEOC notices more than ninety days before he filed his complaint. His suit in this Court is time barred. *Cf. Soso Liang Lo v. Pan American World Airways, Inc.*, 787 F.2d 827 (2d Cir.1986) (per curiam); *Brown v. Mead Corp.*, 646 F.2d 1163 (6th Cir.1981); *Evans v. Continental Banking Co.*, 21 Fair.Empl. Prac.Cas. (BNA) 773 (W.D.Tenn.1979); *Pradia v. Gulf Oil Co.*, 20 Fair.Empl.Prac. Cas. (BNA) 876 (S.D.Tex.1979).

3) *Even Though He Violated the Statutory Limitations Periods, Should Dr. Tadros's Title VII Claim Survive?*

Title VII's time limitations are "specifie[d] with precision," *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974), though they can be modified for equitable reasons, *Zipes v. Trans World Airlines, supra.* Dr. Tadros puts forth no reasons at all why the Court should overlook his lagging and permit his suit to go forward. Accordingly, the Court declines to do so. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984) (per curiam) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out a vague sympathy for particular litigants.... '[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.' ") (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980)); *Brown v. Mead Corp.*, 646 F.2d 1163, 1165 (6th Cir.1981) (equitable tolling "is not an escape valve through which jurisdictional requirements will evaporate"); *cf., e.g., Lopez v. Citibank, N.A.*, 808 F.2d 905 (1st Cir.1987) (no equitable tolling when mental-

ly disabled plaintiff was represented by counsel); *Mull v. Arco Durethene Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir.1986) ("an 'employee's hope for rehire' or for 'a continuing employment relationship' in any capacity does not necessarily justify the exercise of equitable estoppel"); *LaBeach v. Nestle Co.*, 658 F.Supp. 676, 686 (S.D.N. Y.1987).

II. The Civil Rights Act of 1870

■■■ Section sixteen of the Civil Rights Act of 1870, c. 114, § 16, 16 Stat. 144 (codified as amended at 42 U.S.C. § 1981) gives "[a]ll persons within the jurisdiction of the United States ... the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." When he filed this action Dr. Tadros filled out a standard form employment discrimination complaint provided to pro se plaintiffs, which provides in its first paragraph that "[j]urisdiction is also based on 42 U.S.C. § 1981 et seq." Dr. Tadros correctly notes that section 1981 protects people of Arabian ancestry. *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). As the Second Circuit has written, however, section 1981 provides "[n]o greater or lesser protection against discriminatory practices" than does Title VII. *Carrion v. Yeshiva University*, 535 F.2d 722, 729 (2d Cir.1976); *see New York City Transit Auth. v. Beazer*, 440 U.S. 568, 584 n. 24, 99 S.Ct. 1355, 1365 n. 24, 59 L.Ed.2d 587 (1979). *But cf. Patterson v. McLean Credit Union*, —— U.S. ——, ——, 109 S.Ct. 2363, 2372 L.Ed.2d 132 (1989) (section 1981 does not extend to "conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions"). Therefore, "[b]ecause [Dr. Tadros] has not sustained [his] claim under Title VII, [he] also cannot sustain an employment discrimination claim under § 1981." *Beverley v. Douglas*, 591 F.Supp. 1321, 1330 (S.D.N.Y.1984); *see, e.g., Aguirre-Molina v. New York State Div. of Alcoholism*

*& Alcohol Abuse,* 675 F.Supp. 53, 61 (N.D. N.Y.1987).[21]

### III.  Breach of Contract and Fraud

In his complaint Dr. Tadros also asked for one million dollars in compensatory and punitive damages against Dr. Coleman alone for breach of contract and fraud. "Because only the plaintiff's state claims remain for decision, the Court declines to exercise pendent jurisdiction over those claims." *Beverley,* 591 F.Supp. at 1331; *see, e.g., Dunton v. County of Suffolk,* 729 F.2d 903, 910–11 (2d Cir.1984) ("Even if the federal claims are discovered to be patently meritless only after the trial begins, once that discovery is made the state claims must be dismissed along with the federal ones."); *see also Hale v. New York State Dep't of Mental Health,* 621 F.Supp. at 943; *cf. Wescott v. Wackenhut Corp.,* 581 F.Supp. 9, 10 (S.D.Cal.1983).

### IV.  Dr. Tadros's Motion to Amend His Complaint

On May 15, 1989, more than two months after Cornell first noticed its motion for summary judgment and a week after oral argument, Dr. Tadros moved to amend his complaint for the second time. The single page he submitted recites only that "[t]his motion is made on the grounds that: procedural prerequisites may not prejudice the rights of a plaintiff to having his case heard on the merits." Dr. Tadros has failed to comply with Rule 3(b) of the Civil Rules of the United States District Court for the Southern District of New York and

Rule 7(b)(1) of the Federal Rules of Civil Procedure. Accordingly, his motion is denied. *E.g., Wolgin v. Simon,* 722 F.2d 389, 394–95 & n. 10 (8th Cir.1983); *see also Salwen Paper Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 79 F.R.D. 130, 133 (S.D.N.Y.1978) ("Leave to amend may be properly denied, *inter alia,* because of 'undue delay, bad faith or dilatory motive' on the part of the plaintiff or because of the 'futility of amendment.'") (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

### *Conclusion*

The plaintiff's motion to amend his complaint is denied, and the defendants' motion for summary judgment is granted.[22] This case is hereby dismissed.

IT IS SO ORDERED.

### ON MOTION FOR REARGUMENT

In an Opinion and Order dated June 22, 1989, this Court denied the plaintiff's motion to amend his complaint and granted the defendants' motion for summary judgment. Dr. Tadros has now moved for reargument, and, by implication, for vacatur of the judgment against him. Dr. Tadros has also renewed an application under Fed.R. Civ.P. 56(f) to stay the motion for summary judgment so that the parties might reopen discovery.[1] The Court adheres to its prior decision for the reasons discussed below. The motions are denied. Dr. Tadros has merely rehashed his previous contentions,

---

**21.** In his form complaint for pro se plaintiffs Dr. Tadros merely wrote, "Jurisdiction is also based on 42 U.S.C. §§ 1981 et seq." To the extent that that sentence can be read as stating a claim under 42 U.S.C. § 1983—Dr. Tadros never mentioned section 1983 in his papers—Dr. Tadros's claim fails since there is no evidence of state action. *See Beverley, supra,* 591 F.Supp. at 1328–30; *Alcena v. Raine,* 692 F.Supp. 261, 266–67 (S.D.N.Y.1988).

**22.** At oral argument, on May 11, 1989, the defendants asked the Court to impose sanctions on Dr. Tadros under Fed.R.Civ.P. 11; Dr. Tadros submitted a memorandum in opposition on June 9, 1989. The motion for sanctions is denied. *But cf., e.g., Yosef v. The Passamaquoddy Tribe,* 876 F.2d 283 (2d Cir.1989) (rule 11 sanc-

tions imposed on pro se plaintiff who "manipulated the judicial system to an extraordinary degree" in filing "patently frivolous" suit).

**1.** On April 17, 1989 Dr. Tadros filed an "Affidavit in Opposition in Support of Cross-motion, and (Motion) in Opposition," along with a two and one half page "Memorandum of Law and Authorities." Those papers failed to comply with the requirements of Fed.R.Civ.P. 56(f) (discussed *infra* ). Dr. Tadros swore to his latest affidavit on June 20, 1989; it bears a postmark of June 26; and the office of the Clerk of the Court docketed the affidavit on June 28. The Court entered summary judgment in the defendants' favor on June 22. The Court will consider Dr. Tadros's rule 56(f) application despite its untimeliness.

while ignoring the Court's continual advice that he consult his "advisory" counsel.[2]

The prior opinion concluded that Dr. Tadros could not invoke Title VII's protection because he was not Cornell's employee. In response, Dr. Tadros asserts that "[d]espite all citations in plaintiff's memoranda, ... the Court simplistically adopted the 'linguistic' [sic] employee; paid, insurance, pension...." Memorandum in support of motion for reargument at 8 (June 30, 1989) [hereinafter Memorandum for reargument]. Dr. Tadros's argument fails as a matter of law. At an unadorned minimum, a would-be Title VII plaintiff must render the defendant some beneficial service. The prior opinion made clear that Dr. Tadros offered only "[s]urmise, conjecture, and conclusory allegations," *Diduck v. Kaszycki & Sons, supra,* 874 F.2d at 912 (Van Graafeiland, J., dissenting), not proof, that he ever did actual work. In the two months since oral argument on the defendants' motion, Dr. Tadros has filed numerous documents; none refers to, or itself includes, evidence showing that any of the "Cornell Clinical Symposia" took place or that Drs. Coleman or Ellsworth exercised any control over Dr. Tadros's proposals except to reject them. Nor does Dr. Tadros explain how he could have garnered "his financial reward of patients' referral by his students and those who benefitted from his contributions" when he admits that Cornell did not permit him to teach. *Compare* Memorandum for reargument at 2 n. 3 ("Tadros repeatedly asserted that he was not allowed to lecture at Cornell") *with id.* at 8 ("substantial pecuniary loss ... to be estimated at trial for ethics and confidentiality"). In short, Dr. Tadros

merely argues, again, that " 'Volunteers' similie' [sic] is inapplicable here." *Id.* As the Supreme Court has emphasized, however, a party opposing a properly supported motion for summary judgment must offer *"concrete evidence* from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added).[3] This Dr. Tadros has failed to do. Summary judgment was properly entered against Dr. Tadros on the ground that he was not Cornell's employee.

Summary judgment was also proper on the ground that Dr. Tadros failed to comply with Title VII's time limitations. In his motion Dr. Tadros argues that

> retaliatory acts, in different ways, continued the entire year, following a conspiracy of 5 officials, hoping he may quit or go home! Also, it was declared openly by Dr. Coleman personally in a meeting for consult [sic], "Since you complained to Dean, President, and Human Rights...." Tadros, tried to carry on his vocation to relief of human suffering, in blindness ($\frac{2}{3}$ of World blindness are preventable; WHO). Nevertheless, his repeated letters to Dr. Coleman betrayed his deep frustrations, in being severely curbed, while he can be of great help.

Memorandum for reargument at 8. In a previous affidavit Dr. Tadros alleged that the meeting with Dr. Coleman occurred on December 30, 1985, at 4:35 p.m. "Affidavit in Opposition in Support of Cross-motion, and (Motion) in Opposition" at 11 (Apr. 17, 1989). Yet in the last of his "repeated letters," dated March 20, 1986, Dr. Tadros

---

2. Dr. Tadros's latest motion raises no legal argument that differs from any he has maintained since this action began. *Cf. Vekris v. Peoples Express Airlines, Inc.,* 707 F.Supp. 679, 681, 682 (S.D.N.Y.1988). Although Dr. Tadros asserts that he has "never retained 3 different law firms, as 'he can't compete with Cornell's funds,' " Memorandum for reargument at 1 n. 1, his attached affidavit, among many other documents he submitted, refers to "T. Moverman, Esq. my then-counsel," Plaintiff'[s] affidavit pursuant to rule 56(f) at 2 (June 28, 1989); *see also, e.g.,* Exhibit A to plaintiff's memorandum in opposition to defendants' motion for summary judgment (Apr. 17, 1989) (March 9, 1987 letter

from Leonard N. Flamm of Hockert & Flamm to State of New York Division of Human Rights refers to "we, as counsel for Dr. Tadros").

3. Fed.R.Civ.P. 56(e) explicitly provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

wrote to Dr. Coleman, "I would appreciate, as repeatedly requested before; meeting with you at your earliest convenience." The unmistakable inference is that by March 20, 1986 the meeting had still not occurred. And even assuming, for argument's sake, that Dr. Tadros could prove at a trial that the meeting did take place, Dr. Tadros's brief report of the alleged meeting with Dr. Coleman shows that Dr. Coleman did not tell Dr. Tadros anything he did not already know. Therefore, even if it occurred exactly as Dr. Tadros alleges, the December meeting could not have constituted retaliation. *See supra* note 19 (citing *DeCintio v. Westchester County Medical Center*, 821 F.2d 111 (2d Cir.) (act only retaliatory if it disadvantages plaintiff), *cert. denied*, —— U.S. ——, 108 S.Ct. 455, 98 L.Ed.2d 935 (1987)). Dr. Tadros's EEOC filings were untimely.

The prior opinion also explained why Dr. Tadros had failed to raise a genuine issue of material fact concerning his receipt of both the EEOC "Notices of Right to Sue" well over ninety days before he filed his complaint in this action. Dr. Tadros "had actual knowledge, more than ninety days before [he] filed suit, that [he] could sue" Cornell. *Cook v. Providence Hospital*, 820 F.2d 176, 180 (6th Cir.1987). That knowledge makes this suit untimely. And "although there may be [*some*] factual dispute about whether [Dr. Tadros] received the letter, ... [t]here is only one *reasonable* conclusion that can be drawn from this record." *Id.* at 179 (emphasis added). Title VII requires that a plaintiff file his complaint within ninety days after receiving a "Notice of Right to Sue." Dr. Tadros did not comply. His explanations for his mail's itinerary cannot avert the entry of summary judgment against him.

Dr. Tadros's other contentions deserve less discussion. Dr. Tadros challenges the dismissal of his section 1981 claim on the following grounds:

T[h]is claim under 42 USC 1981 filed within 3 years of defendants['] termination survives by itself.... As it was 3 years after Beverly's [sic], it overrules, both chronologically and authoritatively. Besides, Dr. Beverly [sic] was not of Arabian ancestory [sic].

Section 1981, of course, is not restricted to persons of Arab descent; Dr. Beverley, a black woman, lost on her section 1981 claim for race and sex discrimination because, like Dr. Tadros, she had failed to succeed on her Title VII claim.[4] Dr. Tadros then argues that there exist critical issues of fact with respect to the release he signed on June 19, 1985. Given the Court's disposition of Dr. Tadros's federal causes of action, the merits or demerits of his pendent state law claims for breach of contract and fraud are irrelevant. As for his motion to amend his complaint for a second time, Dr. Tadros argues that he "did indeed abided [sic] by the essence of both rules." In fact, however, Dr. Tadros has still not cured his papers' manifest flaws. His motion was properly denied. *Cf. Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) ("undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by allowance of the amendment, futility of amendment, etc.," justify denial of motion to amend complaint).

Finally, Dr. Tadros asks the Court to vacate its entry of summary judgment so that the parties may conduct further discovery. Under Fed.R.Civ.P. 56(f) "summary judgment may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition." Fed.R.Civ.P. 56(f) advisory committee notes to 1963 amendment; *see also Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511–12 (2d Cir.1989). According to Dr. Tadros,

as defendants resorted to a twist, by perplexing 2 points, ... discovery continuance became mandatory to resolve such ambiguities. Specifically this would be

---

**4.** The Supreme Court has since held that section 1981 provides *less* protection than Title VII does. *See Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

limited to the deposition of: A—Drs. Coleman and Ellsworth—to establish the control and supervision of plaintiff's work, B—Ms. Kayser [sic]—to clarify the hearsay conclusion of her contreversial [sic] affidavit, [and] C—EEOC's H. Wilkes, P.A. Hicks & Y. Johnson—to scrutinize their credibility, in their undocumented information and other violations....

Plaintiff's affidavit pursuant to rule 56(f) at 3 (June 28, 1989). In light of the discussion in the prior opinion, however, it is evident that Dr. Tadros has "proffered no persuasive basis for [this] court to conclude that further discovery would yield proof" that he ever did any work for Cornell or that he met Title VII's time limitations, "which [made up], after all, the nub of the [defendants'] motion for summary judgment." *Trebor Sportswear*, 865 F.2d at 512. Further discovery is wholly unwarranted.

### Conclusion

Dr. Tadros's motions are denied. The Opinion and Order of June 22, 1989 is reaffirmed in its entirety.

IT IS SO ORDERED.