**Suzanne M. PEMRICK, Ph.D., Plaintiff,**

**v.**

**Alfred STRACHER, Ph.D.; Richard Schwarz, M.D.; State University of New York (Suny); and Suny, Brooklyn, Defendants.**

No. 92–CV–0959 (JS)(CLP).

United States District Court, E.D. New York.

Nov. 8, 1999.

Suzanne M. Pemrick, East Chatham, NY, pro se.

Gary P. Weinstein, Assistant Attorney General, New York City, for defendants.

*MEMORANDUM & ORDER*

SEYBERT, District Judge.

Plaintiff Suzanne M. Pemrick, Ph.D., who has proceeded *pro se* throughout most of this litigation, sues the State University of New York; the State University of New York at Brooklyn; Alfred Stracher, Ph.D.; and Richard H. Schwarz, M.D., pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), for alleged sex and age discrimination and sexual harassment. Defendants Stracher and Schwarz are sued only in their official capacities. After nearly a decade of litigation and numerous protracted discovery disputes, the defendants bring the present motion for summary judgment, arguing primarily that SUNY was not and never has been plaintiff's employer. For the reasons discussed below, the motion is granted in part and denied in part.

### BACKGROUND

At the outset, it is clear from the parties' respective statements pursuant to Local Civil Rule 56.1 that there are many disputed issues of fact. As discussed *infra*, while some of these facts are irrelevant to the issues before the Court, others represent genuine issues of material fact requiring that much of the motion be denied.

Plaintiff Suzanne Marie Pemrick, Ph.D. ("Pemrick") met defendant Alfred Stracher, Ph.D. ("Stracher") in 1972. Affidavit of Suzanne M. Pemrick ("Pemrick Aff."), ¶ 2. At the time, Pemrick was completing her post-doctoral research training, while Stracher had just been named Chair of the Department of Biochemistry at the State University of New York Health Science Center at Brooklyn ("SUNY–HSCB"), formerly known as Downstate Medical Center ("SUNY–DMC").[1] *Id.;* Affidavit of Alfred Stracher ("Stracher Aff."), ¶ 1.

---

1. The Court will use the terms "SUNY–DMC" and "SUNY–HSCB" interchangeably throughout this Memorandum and Order.

In 1977, Pemrick, having just completed a fellowship at Mount Sinai School of Medicine, was looking for a tenure-track faculty position in a medical school or research institution. Pemrick Aff., ¶¶ 4–5. Stracher told Pemrick that a tenure-track position was available in his department and invited her to apply for this position. *Id.,* ¶ 5. Shortly after Pemrick's interview at SUNY–DMC, Stracher told her that there was a hiring freeze within SUNY that prevented the institution from filling the vacant position. *Id.,* ¶ 6. According to Pemrick, Stracher nevertheless promised her that as soon as the freeze was lifted, she would be appointed to the next available tenure-track position at SUNY. *Id.* In the interim period, Stracher told Pemrick to submit grant applications to both the National Institutes of Health ("NIH") and the National Science Foundation ("NSF"). *Id.,* ¶ 7. Stracher advised her to submit the applications under the auspices of SUNY–DMC, with Pemrick listed as principal investigator, because both NIH and NSF required that the principal investigator have a faculty appointment. *Id.* Pemrick thereafter submitted the applications with the sponsorship of Stracher and SUNY–DMC. *Id.*

Stracher, not surprisingly, remembers these 1977 events differently. Stracher states that he knew at the time that Pemrick's fellowship at Mount Sinai was ending, and that she had a grant application pending—an application that would be jeopardized if she did not relocate to an institution that would sponsor her research. Stracher Aff., ¶ 3. Therefore, Stracher assisted Pemrick in obtaining a temporary position as a technical specialist for the Research Foundation of SUNY,[2] a private corporation located at the SUNY–DMC campus, beginning in the fall of 1977. *Id.* Thereafter, Stracher continued his goodwill toward Pemrick by helping her obtain an unpaid, temporary, non-tenure-track position as an Assistant Professor in the Department of Biochemistry. *Id.* This appointment enabled Pemrick to carry out her NIH grant research at the SUNY–DMC campus. *Id.*

In approximately February 1978, Pemrick learned that her NIH grant application had been approved and that the grant would be funded for three years. Pemrick Aff., ¶ 8. Pemrick's NIH grant, although her first, was one of the largest grants at SUNY–DMC, on par with the tenured professors. *Id.* This grant continued to be one of the largest at SUNY–DMC for the next eight years. *Id.*

A few months later, in May 1978, Stracher told Pemrick that he was initiating paperwork necessary for her SUNY–DMC appointment, at the rank of Assistant Professor. *Id.,* ¶ 9; *see also* Exh. SPA–# 3. In August 1978, Pemrick received a letter of appointment from Edward Dorfman, the Vice President of SUNY–DMC, indicating that the President of SUNY–DMC had extended Pemrick a temporary appointment as an Assistant Professor in the Department of Biochemistry. *Id.* The appointment was effective April 1978, with a salary of $23,000 supplied via the Research Foundation of SUNY. *Id.; see also* Exh. SPA–# 4. Pemrick accepted this appointment. *Id.,* ¶ 10. At this time, all tenured faculty and tenure-track appointments in the Biochemistry Department at SUNY–DMC were male. *Id.,* ¶ 11; *see also* Exh. SPA–# 6.

In 1979, according to Stracher, Pemrick applied for a vacant SUNY-salaried tenure-track position in the Department of Biochemistry. Stracher Aff., ¶ 5. Stracher maintains that Pemrick was not selected for this position because she was not the best qualified candidate. *Id.* At the time, Pemrick was thirty-seven years old.[3] *Id.*

---

2. This name is accurate. *See* Exh. MOL–# 4. Defendants, however, conveniently refer to this entity throughout their papers simply as "the Research Foundation," no doubt attempting to create some distance between the foundation and SUNY itself.

3. Pemrick was born in 1942. *See* Exh. SPA–# 20.

However, there is a factual discrepancy regarding plaintiff's application for this position. Pemrick recalls that she became aware of an available tenure-track position in the Biochemistry Department in the fall of 1978. Pemrick Aff., ¶ 15. Upon hearing of this opening, Pemrick reminded Stracher of his prior commitment to her, and applied for the position. *Id.* Around this time, Pemrick alleges that she began to feel harassed and discriminated against on the basis of her sex. *Id.,* ¶ 16.

Among Pemrick's complaints of harassment are the following, all of which occurred following her application for the open position in the fall of 1978. First, Dr. Chan, a member of the all-male search committee referred to Pemrick as a "post-doc" although she was a faculty member. *Id.* Another member of the committee, Dr. Detwiler, stated that if he were Pemrick, he would find it difficult to see less-qualified applicants being interviewed for the position, but that Pemrick should just go away and pout about it. *Id.* Later, upon asking Detwiler about the status of her application, Pemrick was asked, "Is the reason you want to know so you can do something about it?" *Id.,* ¶ 17.

Later, Pemrick had several of what she classifies as harassing and intimidating encounters with Dr. Feinman, the chair of the search committee. Pemrick Aff., ¶ 18. One day, while Pemrick was working in the library, Feinman confronted her and told her that if she continued to push her application for a state-funded line in the Biochemistry Department, he would see to it that she never got one. *Id.* Another time, Feinman entered Pemrick's small office and blocked her exit. *Id.* He again discussed with her the application for the tenure-track position, repeatedly punctuating his conversation with the words "fuck you." *Id.*

Feinman also indicated to Pemrick that if she kept pushing for the position, she would make everyone angry, including Stracher. *Id.* Feinman told her that she could always go to court, but that if she did, her career would be jeopardized because other institutions would be told. *Id.* He also told Pemrick that even if she got the position, the faculty would never vote her tenure. *Id.* Feinman also said that the faculty would not honor Stracher's commitment to her when she joined the department. *Id.* He also referred to her as a post-doc, even though she pointed out her Assistant Professor title. *Id.*

On another occasion, Pemrick was told by a male member of the Biochemistry Department, Dr. Gerber, that the search committee was considering filling the position with two people who had the same specialty as Pemrick. Pemrick Aff., ¶ 19. Gerber told Pemrick that her problem was that she "didn't know enough when [she] was being screwed to relax and enjoy it." *Id.*

Pemrick, however, did not follow Gerber's advice. Instead, she took her complaints to Leslie Rogowsky, an Affirmative Action Officer.[4] Upon meeting with Rogowsky, Pemrick requested a copy of the position listing for the vacancy in the Biochemistry Department. Pemrick Aff., ¶ 20. Pemrick discovered that the position had been advertised in Science magazine in November 1977—shortly before Pemrick's arrival at SUNY–DMC. *Id.* Rogowsky told Pemrick that the department did not select a candidate from that search, but had re-defined their need, and placed another ad in Science for a neurochemist. *Id.* Plaintiff believes that the position was re-defined in order prevent her from applying and receiving a position for which she was qualified. *Id.*

Pemrick also discussed with Rogowsky the verbal harassment and intimidation she had received since applying for the position in Biochemistry. *Id.,* ¶ 21. She

---

4. Although not clear, it appears that Rogowsky was employed by SUNY–DMC, not the Research Foundation of SUNY.

told Rogowsky that she thought the incidents constituted sex discrimination. *Id.* However, much to Pemrick's surprise, Rogowsky told her that "fuck you" was not sex discrimination because the phrase could be just as easily used by a woman to another woman. *Id.* Apparently to illustrate her point, Rogowsky began to use the phrase repeatedly during the course of the conversation with Pemrick. *Id.* Pemrick felt very uncomfortable in Rogowsky's office. *Id.*

Pemrick also alleges that, as she pursued this first application, Stracher's staff began to refer to her as an "evil woman," and were told that bad things would happen to them if they spoke to her. Pemrick Aff., ¶ 22. Rogowsky told Pemrick that Stracher was becoming very negative toward her. *Id.,* ¶ 23. Stracher himself threatened to refuse to sign the yearly continuation of Pemrick's grant if she continued to pursue her application for a state line at SUNY–DMC. *Id.,* ¶ 24.

In November 1979, the department position was filled by Dr. Alan Gintzler, who was appointed as an Assistant Professor. *Id.* The SUNY–DMC Affirmative Action Search Process Report indicates that six persons applied for the position, five males and one female. *See* Exh. SPA–# 11. Neither Pemrick's name nor Gintzler's name was listed as an applicant. *Id.* The form, which is signed by Stracher, but not by an affirmative action reviewer, indicates that the position became available on January 1, 1978; that the search process began on March 1, 1978; and that Gintzler's appointment was effective November 1, 1979. *Id.* Gintzler was to be paid on a "State Line" rather than on a "Research Line," at salary of $24,500. *Id.*

Pemrick nevertheless continued her research. In 1980, Stracher approved and supported Pemrick's application to NIH for a Research Career Development Award. Pemrick Aff., ¶ 27. Stracher provided a "chairman's commitment state-

ment" for the application, but cited SUNY's hiring freeze as the reason why Pemrick had not been given a tenure-track position.[5] *Id.* In the end, the NIH did not make this award to Pemrick, principally because of the uncertainty of long-term commitment to Pemrick from SUNY–DMC. *Id.,* ¶ 28.

Despite not receiving this award, Pemrick's NIH research grant was renewed for an additional five years, at twice the level of funding per year. *Id.,* ¶ 29. However, she continued to learn that she was being treated differently than similarly-situated male faculty members. For example, Dr. Feinman, who originally was paid through the Research Foundation of SUNY, was moved to a regular SUNY tenure-track line at the time he applied for a Research Career Development Award. *Id.,* ¶ 30; *see also* Exh. SPA–# 12. Moreover, SUNY promoted at least two male faculty members to full professorships—Dr. Lerner in the early 1980s and Dr. Kesner in 1989—who did not have active research grants at the time of their appointments. *Id.,* ¶ 32.

Plaintiff categorizes the sexual harassment and discrimination she suffered as Level I Harassment to Level VII Harassment. The levels of harassment appear to be indicative of both severity and chronology. Pemrick Aff., ¶ 33.

Among these claims of harassment is a series of gender-specific remarks made to Pemrick, and the continuation of a "wall of hostility" against her between 1980 and 1983. *Id.* For example, Pemrick alleges that Stracher threatened her by stating to her that he would personally prove to her that being good at what she did would get her nowhere, and that he was going to make it difficult for her at SUNY–DMC. *Id.,* ¶ 34. In late 1980 or early 1981, Stracher told Pemrick that if she purchased any more equipment between then and April, she could put wheels on the

---

**5.** There is no explanation in the record why the supposed hiring freeze at SUNY applied

to Pemrick both in 1978 and 1980, but did not apply to Gintzler in 1979.

equipment so that he could wheel it out when he got rid of her.[6] *Id.*

In approximately May 1981, Pemrick claims that Dr. Detwiler began a practice of verbal gender harassment that was to continue for the next seven years. Pemrick Aff., ¶ 34. Pemrick claims that, in response to virtually any comment she made—regardless of context—Detwiler consistently respond "you bitch, complaining again." *Id.* Pemrick claims that at times, Detwiler even would interrupt conversations she was engaged in with others, only to say the same thing. *Id.*

The following year, Pemrick claims that Stracher repeatedly obstructed her professional activities. Specifically, Stracher rescheduled her research seminar, failed to inform staff that the seminar had been rescheduled, and then arranged for the seminar room to be painted on the day scheduled for the seminar to be presented. *Id.* In the same time frame, Pemrick's laboratory was scheduled to be painted, but Pemrick was informed by an individual in the Facilities and Planning Department that Stracher had removed her laboratory from the list of labs to be painted, and that her lab was the only lab at SUNY–DMC to be removed from the list. *Id.* After her lab finally was painted, Dr. Silverman of the Biochemistry Department allegedly asked Pemrick, "when are you going to hang curtains?" *Id.*

Pemrick alleges that other members of the department also harbored sexually discriminatory attitudes and manifested these attitudes in the form of sexually hostile treatment and comments. For example, Pemrick spent eight years during which her lab was next door to the office of Dr. Gintzler. *Id.* However, during this time Gintzler never spoke to her. *Id.* On occa-

sion, however, Gintzler would attempt to collide with Pemrick as they walked down the hall in opposite directions. *Id.* Additionally, in November 1983, Dr. Kesner entered Pemrick's lab and told her, out of the blue, that he did not know if he should be alone with a woman. *Id.* Later that day, Kesner allegedly interrupted a conversation Pemrick was having with Dr. Lerner to tell Pemrick to stop talking to Lerner because Lerner was married. *Id.*

On another occasion, in fall of 1983, Pemrick claims that upon asking Dr. Detwiler about a scientific meeting he had attended in Sweden, Detwiler responded, "Do you mean how many women did I successfully impregnate?" *Id.* Pemrick also claims that Stracher intentionally obstructed her hiring of Sharon Dillon, an African–American, by refusing to sign a personnel form, even though such signatures usually were given pro forma. *Id.* Pemrick also alleges that she was removed from the faculty mailing list at Stracher's instructions. *Id.*

Pemrick's self-styled Level II Harassment began to occur in 1982 or 1983, after she had begun participating in a Committee on Women's Concerns at SUNY–DMC. Pemrick Aff., ¶¶ 35, 38. During this time frame, Dr. Detwiler, apparently in the presence and with the agreement of Stracher, asked Pemrick how there could be a committee at SUNY–DMC that was devoted to women's concerns, since women have no concerns other than their menstrual periods. *Id.*, ¶ 38. Pemrick did not complain about this incident because the Affirmative Action Officer had told her that there was no complaint process for her at SUNY–DMC about SUNY–DMC employees because Pemrick was paid by the Research Foundation of SUNY. *Id.*

---

**6.** Although not set forth explicitly by the parties, it appears that the practice of purchasing scientific research equipment with the proceeds of a grant is the custom in the research field. The Court, admittedly not schooled in the norms of the scientific world, also infers from the papers that the equipment purchased by a principal investigator with grant proceeds typically remains the property of that person, even in the event that the investigator transfers to another institution. However, it also appears that the institute awarding the grant may have certain requirements for the purchase of equipment and its retention by the investigator and/or the sponsoring research institution.

Stracher also allegedly told Pemrick that she was becoming too visible at SUNY–DMC and told her to keep a lower profile. *Id.*, ¶¶ 40–41.

Toward the end of October 1983, Pemrick discovered that her laboratory was to be partitioned, with the result that her remaining part of the lab would lack water, electric, vacuum and gas services. *Id.*, ¶ 44. She was informed that Dr. Stracher had ordered the Facilities and Planning Department to construct this partition. *Id.* Upon seeing this partition in Pemrick's lab, a faculty member whose lab was located across the hall from Pemrick's told her that she should be conscious of her physical safety and avoid situations where she would be alone with Stracher. *Id.* ¶¶ 45–46. A few days later, Dr. Kesner approached Pemrick and told her that she was a menace and the department was better off before it had any women. *Id.*, ¶ 47.

Pemrick's Level III harassment constitutes a series of incidents involving Stracher's allegedly bizarre and irrational behavior, including requests that plaintiff write a letter stating that she refused to teach, even though she wanted to teach; obstruction of her daily research activities; delaying the hiring of Pemrick's staff; screaming at her; and physically threatening her by backing Pemrick into a corner of her laboratory while in a "highly emotional and agitated state." *Id.*, ¶¶ 48–60. Pemrick also claims that during this time frame, Stracher continued to block her attempts to receive a state-funded line in his department or to make a lateral move to another department. *Id.*, ¶ 73. At one point, an external evaluator visiting SUNY–DMC from Harvard University told Pemrick that Stracher could not stand competition from a woman. *Id.*, ¶ 74.

Also relevant to plaintiff's claims is that in 1985, 1986 and 1987, Pemrick wrote several letters to SUNY–DMC officials in Brooklyn, as well as SUNY Central Administration officials in Albany. Stracher Aff., ¶ 8. These letters complained that the Department of Biochemistry, and Stracher in particular, had discriminated against Pemrick on the basis of her gender. *Id.* In June 1987, SUNY–DMC president Donald S. Scherl, M.D., appointed an ad hoc committee chaired by Dr. George Frangos to review Pemrick's allegations. *Id.* In August 1987, this committee concluded that no gender discrimination had occurred. *Id.* A report of the committee's findings was issued to Scherl. Affidavit of Pamela Miller Williams ("Williams Aff."), ¶ 7. Defendants, however, have not provided a copy of the committee's conclusions or report to the Court, have not specified who served on that committee, and have not presented any document indicating what evidence, if any, it relied upon in reaching this conclusion.

Defendants also leave out the fact that the ad hoc committee did not exonerate Stracher from any finding of misconduct. In fact, at least one member of the ad hoc committee expressed his dismay about Stracher's treatment of Pemrick, and the prospect that Pemrick's entire career had been ruined by Stracher. *See* Exh. MOL–# 29. Dr. Kiyomi Koizumi, in a memorandum to two members of the committee, expressed his strong desire to do more than simply send the committee's recommendation to Scherl. *Id.* Koizumi told Frangos and Rudolf M. Williams[7] that he thought the committee was handling "a sort of life and death situation of a scientist and our faculty member." *Id.*

Koizumi concurred with the committee members that no *sexual* discrimination had occurred regarding Pemrick, although his qualifications for making such an assessment and the evidence he relied upon are not detailed. *Id.* However, he stated that the committee's interview with

7. The papers do not indicate who Williams is or his affiliation, if any, with SUNY–DMC or

the Research Foundation of SUNY.

Stracher made him uncomfortable. *Id.* Koizumi wrote:

> I do not believe that the chairman's conduct and treatment of Suzanne [Pemrick] has been fair; I cannot agree with everything Al [Stracher] said during our telephone conversation. Because of the power which a chairman possesses over a junior faculty member, particularly one who has no tenure, his negative attitude towards him/her can immensely annoy, intimidate and alienate the person and even ruin his/her future. A chairman's conduct, when explained as Al did yesterday, can be made to appear very reasonable to outsiders. Al's explanation we heard yesterday could almost convince anyone that all faults lie with Suzanne—her bad behavior and her aggressive attitude. When I reconsidered our interview with him and the other three persons and also reflected on my own experiences with other chairmen, it was not so difficult for me to understand why Suzanne was driven to where she is now.

> Our task is not to investigate and find fault with any party involved in this case. As a completely separate issue from the task of our ad hoc review committee and our decision on the investigation of sexual discrimination, I would like to convey to our President, our, or at least my own opinion, i.e. we should not permit ourselves to ruin Suzanne's future so easily and so completely.

> Our committee's decision and recommendation will end Suzanne's career and nearly destroy the future of a bright scientist who has been a member of our faculty for nine years (regardless of how her salary was paid). Considering our President's efforts to promote the faculty's research at this Center and to try to rejuvenate and activate basic science departments again, it cannot be denied that Suzanne's case has been handled badly by all concerned.

> To rescue Suzanne at this point and to give her one more chance to start her research (she has been less productive in recent years but was in a most difficult and trying environment, regardless of who created it), it may be possible to give her a part-time position in the Graduate School and joint appointments in Biophysics and probably Cell Biology, if they agree....

> In the present situation Suzanne will probably never be able to get a job elsewhere since her chairman clearly stated yesterday that he would refuse to write a letter of recommendation for her though Dean Schwarz said he would. (I think in our scientific community it is almost crucial to obtain a good recommendation from one's departmental chairman.) Once Suzanne can begin her research seriously, and if she is successful in getting grant support, she may be able to get a job somewhere. It is surprising to me that Suzanne did receive a five-year NIH grant twice. In the present tight grant money situation, most funded grants are for three years and only very few excellent proposals receive five-year funding. We should also note that interest and high evaluation given to her proposal by the NIH officer ... demonstrate her capability in research.

> If you two do not wish to join me in writing an additional "personal" opinion on this matter to our President, please at least mention to President Scherl that I am very much concerned about Suzanne's future and wish to write him my personal letter as soon as I can.

Exh. MOL–# 29. There is no indication in the record whether Frangos or Williams, the recipients of this memorandum, concurred in Koizumi's assessment of the situation between SUNY–DMC and Pemrick. However, in an August 18, 1987 letter to Scherl, Koizumi expressed to president Scherl his personal feelings regarding the matters described in his previous memorandum to Frangos and Williams. *Id.*

While all of these events were taking place, a tenure-track, SUNY-salaried posi-

tion opened up in the Department of Biochemistry in 1985 following the death of Dr. Donald Kirschenbaum. Defendants' Rule 56.1 Statement ("Def. 56.1 Stmt."), ¶ 8. Three searches were conducted between 1986 and 1988 to hire a replacement. *Id.*, ¶ 9. Based on an external review report, SUNY–DMC sought to fill the position with a molecular biologist. *Id.* ¶ 10. During the first search, Pemrick and others applied. *Id.*, ¶ 11. The search committee selected a female candidate, Dr. Nancy Currasco, M.D., who declined the offer. *Id.*, ¶ 12. Defendants claim that Currasco was a specialist in molecular biology, a claim disputed by Pemrick. Id.; Plaintiff's Rule 56.1 Counter–Statement ("Pl. 56.1 Stmt."), ¶ 16. Pemrick points out that Currasco did not have a Ph.D., but instead held only a medical doctor ("M.D.") degree from a foreign medical school. Pl. 56.1 Stmt., ¶ 12.

According to Stracher, Pemrick was not selected for this position because she was not a molecular biologist. Stracher Aff., ¶ 6. Stracher claims that Pemrick's specialty was muscle research, a field that was Stracher's own specialty, and thus already was represented in the department. *Id.*

SUNY–DMC then commenced a second search to fill the same position. *id.*, ¶ 7. SUNY–DMC advertised in the publications Science and Association of Women in Science. *Id.* The defendants admit that Pemrick again applied for this position, and that she received an interview. *Id.* Stracher claims that Pemrick was interviewed upon the recommendation of defendant Dr. Richard Schwarz, M.D., the former Dean of the College of Medicine, and Leslie Rogowsky, the SUNY–HSCB Affirmative Action Officer, both of whom wanted to ensure that internal candidates were given opportunities for advancement. *Id.* In addition to Pemrick, thirty-six other candidates applied, ten of whom were female. *Id.*

The search committee selected a female candidate, Dr. Lakshmi Devi, to fill the position. Stracher Aff., ¶ 7. According to Stracher, Devi had a specialty in molecular biology. *Id.* Again, Stracher claims that Pemrick was not selected, despite having been interviewed, because she was not a molecular biologist. *Id.* Devi eventually declined the position. *Id.*

Following the second round of this search, and after the issuance of the August 1987 ad hoc committee report to SUNY–DMC president Scherl, negotiations ensued between SUNY–DMC and plaintiff, who then was represented by counsel, in order to resolve their difficulties. Williams Aff., ¶ 9. Negotiations culminated in a settlement agreement of sorts between Pemrick and SUNY–HSCB.[8] *Id.*, ¶ 10, Exh. 1. Pursuant to the terms of the agreement, Pemrick submitted two letters of resignation to SUNY–HSCB, one postdated August 31, 1988 and the other postdated August 31, 1989. *Id.*, ¶ 11. The agreement provided that Pemrick would resign her SUNY faculty appointment effective August 31, 1988, unless her NIH grant funding was renewed, in which case her resignation would take effect August 31, 1989. *Id.*

In conjunction with this agreement, both parties executed general releases. *Id.*, ¶ 12. SUNY–HSCB agreed to continue Pemrick's appointment with salary from the Research Foundation of SUNY until the effective date of resignation,[9] and to

8. Given the defendants' argument that SUNY–DMC is not and never was Pemrick's employer, it is curious that SUNY–DMC nevertheless entered into negotiations with Pemrick in the first place, and even more curious that these negotiations culminated in a written document.

9. Again, given the defendants' present argument, one wonders what authority SUNY–

HSCB had to agree that the Research Foundation of SUNY—supposedly a completely independent and private corporation—would continue to supply Pemrick's salary. *See* Affidavit of James R. Dennehey ("Dennehey Aff."), ¶ 3 ("[t]he Research Foundation is a private, non-profit corporation, which ... is a separate corporate entity from the State University of New York."). Additionally, one

allow Pemrick continued access to her laboratory during that period. *Id.*, ¶ 13. The agreement and the releases were dated September 11, 1987. Williams Aff., Exh. 1.

A third search then was commenced to fill the position vacated by Dr. Kirschenbaum's death. Stracher Aff., ¶ 10. SUNY–DMC advertised the position for a molecular biologist together with other basic science vacancies in the journals Cell and Nature. *Id.* One hundred and seven candidates applied, seventeen of whom were female. *Id.* Defendants assert that Pemrick did *not* apply for the position during the third search. *Id.* Defendants also claim that they did not receive any correspondence or communication from Pemrick indicating her interest in the position. *Id.* Defendants also contend that they did not independently consider Pemrick for the position because she had entered into an agreement to leave the institution in 1988 or 1989. *Id.* The position ultimately was offered to and accepted by Dr. Gregory Gick, Ph.D., in April 1988. *Id.* Pemrick's resignation took effect on August 31, 1988, after the NIH did not fund her grant proposal. Def. 56.1 Stmt., ¶ 34.

For her part, Pemrick disputes that defendants were, in fact, searching for a molecular biologist, and claims that this proffered reason is merely a pretext for the defendants' unlawful sex discrimination. Pl. 56.1 Stmt., ¶¶ 16–23. Pemrick points out that (1) Dr. Currasco, to whom the open position first was offered, possessed only a medical doctor degree from a foreign university; (2) Dr. Devi, to whom the position later was offered, possessed a Ph.D. in microbial biochemistry and physiology—not molecular biology; and (3) Dr. Gick, to whom the position ultimately was offered and who accepted the position, had a Ph.D. in biochemistry—not molecular

biology. Exh. MOL–EX# 10; *see also* Reply Affidavit of Alfred E. Stracher, ¶ 3, Exh. 3.

At oral argument on this motion, plaintiff represented that her doctoral degree from the University of Cincinnati was "unrestricted as to specialty." Transcript of Oral Argument, July 9, 1999, at 34. Plaintiff stated that the diploma

> indicates a doctorate of philosophy degree. However, it obviously is given in a graduate school as a result of working in a particular department. I worked in a department of biological sciences that was my thesis and my thesis was in molecular biology as defined by defendants. It was what is called a gene transcription and gene translation. Gene transcription being RNA synthesis and gene translation being protein synthesis.

*Id.* Thus, Pemrick claims that if anyone involved in these events was qualified as a molecular biologist, she was.

In regard to the agreement that was executed by the parties on September 11, 1987, Pemrick claims that regardless of the defendants' position now, the document speaks for itself. Pl. 56.1 Stmt., ¶¶ 27–28. Pemrick also contends that any release of liability applied only to events that occurred prior to the agreement's execution date, and that the release was conditioned upon faithful performance by SUNY–DMC. *Id.* Plaintiff disputes the defendants' assertion that the "explicit purpose" of the agreement was to end her affiliation with SUNY–DMC. *Id.*, ¶ 29. In any event, Pemrick claims that SUNY–DMC immediately breached the agreement, and that a trier of fact must determine whether the defendants fraudulently induced her to sign the agreement. *Id.*, ¶ 32.

wonders why this agreement was negotiated by Pamela Miller Williams, at the time an Assistant Counsel in the SUNY Central Administration University Counsel's Office, rather than Mr. Dennehey, who was at the time

Counsel to the Research Foundation. *See* Williams Aff., ¶ 1; Dennehey Aff., ¶ 1. Notably, the agreement was signed by Peter B. French, Vice President of Administration and Finance at SUNY. Williams Aff., Exh. 1.

Despite the agreement, which purportedly ended Pemrick's affiliation with SUNY–DMC on August 31, 1988, Pemrick was hired as a consultant by Dr. Kao on a SUNY–HSCB faculty research project in the Spring of 1989. Dennehey Aff., ¶ 8. In this capacity, Pemrick was paid from an account administered by the Research Foundation of SUNY. *Id.* Pemrick's consultancy ended on March 29, 1990. *Id.* After a subsequent determination by the Internal Revenue Service that Pemrick did not meet the criteria for a consultant for federal income tax purposes, this appointment retroactively was converted to an employment relationship between Pemrick and the Research Foundation of SUNY. *Id.*

In relation to Pemrick's last stint at SUNY–HSCB (from April 1989 to March 1990), Pemrick alleges that she was further subjected to a hostile environment. She complains of long delays in receiving paychecks, vandalism to her car, harassment upon entering the building, and vandalism of a laboratory in which she routinely worked. *Id.* Pemrick claims that SUNY–DMC refused to investigate the vandalism of the laboratory, which she felt could have been an attempt to cause her serious bodily harm. *Id.* Pemrick also allegedly was warned by Dr. Kao not to report the laboratory vandalism incident or else she would be fired. *Id.* In fact, according to Pemrick, she reported the incident to the police, and subsequently was fired. *Id.* Plaintiff left SUNY–HSCB permanently in April 1990.

## LEGAL STANDARD

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *In Re Blackwood Assoc., L.P.,* 153 F.3d 61, 67 (2d Cir.1998) (citing Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998) (citing *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988)). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the nonmovant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996). The trial court's responsibility is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir.1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994)).

However, when there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, there must exist "specific facts showing that there is a genuine issue for trial" in order to deny summary judgment as to a particular claim. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548, 106 S.Ct. 2548. It is against this backdrop that the Court considers the present motion.

## DISCUSSION

Plaintiff filed this lawsuit on July 30, 1990 in the United States District Court for the Northern District of New York. This action, upon motion of the defendants, was transferred over plaintiff's objection to the Eastern District of New York in 1992. In her amended complaint, Pemrick alleges that the defendants failed to hire her; unlawfully terminated her employment;

failed to promote her; and provided her with unequal terms and conditions of employment. Amended Complaint, ¶ 12. Plaintiff also claims that the defendants retaliated against her and blocked her research efforts. *Id.*, ¶ 13.

The defendants present four arguments in support of their present motion for summary judgment. First, the defendants argue that SUNY–HSCB was not Pemrick's employer and thus all claims against SUNY–HSCB must be dismissed as a matter of law. Second, defendants assert that Pemrick cannot produce any evidence of their violation of Title VII or of the ADEA. In this regard, defendants claim not only that Pemrick cannot make out a prima facie case of gender discrimination, but also that defendants had legitimate, non-discriminatory reasons for not hiring her, and that Pemrick has not produced any evidence of intentional discrimination. Third, defendants argue that Pemrick is barred from suing Stracher and Schwarz as individuals under Title VII. Finally, defendants argue that the Court has no jurisdiction to consider claims that Pemrick did not raise in her administrative filing. The Court addresses each argument in turn.

## I. Employer Status Under Title VII

■ Defendants' first argument is that SUNY–DMC was not Pemrick's employer, and therefore cannot be subject to liability under Title VII. Instead, according to the defendants, Pemrick was employed by the Research Foundation of SUNY—not SUNY–DMC.[10] Defendants point out that Pemrick was paid entirely from the Research Foundation of SUNY, by way of

grants that Pemrick herself obtained. Moreover, defendants assert that Pemrick received no fringe benefits from SUNY–DMC. Defendants claim that because Pemrick's affiliation with SUNY–DMC was a result of a voluntary, temporary appointment, SUNY–DMC was not her employer.[11]

Pemrick argues in response that although she was paid by the Research Foundation of SUNY, her relationship with SUNY–DMC nevertheless was one of master-servant. She asserts that SUNY staff, notably Stracher, controlled the terms and conditions of her work, and that because of the defendant institution's sponsorship of her research grant applications, it was only through SUNY–DMC that she could have obtained her grants in the first place. Pemrick also asserts that SUNY–DMC and the Research Foundation of SUNY are either integrated employers or joint employers. In support of this argument, she submits the corporate charter of the Research Foundation of the State University of New York, which to her indicates that the Research Foundation of SUNY essentially is an arm of defendant State University of New York. Pemrick also argues that because of her affiliation with SUNY–DMC, she obtained valuable economic benefits, primarily the opportunity to apply for and receive grants to continue her research, to pay her salary, and to purchase laboratory equipment.

Moreover, Pemrick argues that she maintained her affiliation with SUNY–DMC for at least a decade, awaiting the day when Stracher would fulfill his promise to appoint her to a tenure-track,

---

**10.** This Court denied plaintiff's motion for leave to amend her complaint to add the Research Foundation of SUNY as a defendant on November 20, 1998. Among other reasons, the Court denied the motion for leave to amend because of the prejudice to the parties that would result from plaintiff's unexplained eight-year delay in seeking to add the Research Foundation of SUNY as a defendant; because plaintiff never obtained a right to sue letter from the EEOC as against the Research Foundation of SUNY; because of statute of

limitations defects; and because the Research Foundation of SUNY could not provide plaintiff with the primary relief she seeks, namely, a tenured faculty position within the SUNY system.

**11.** The plaintiff's failure to hire claim, of course, would be unaffected by a determination that SUNY–HSCB was not Pemrick's employer at the time of the alleged harassment.

SUNY-funded faculty position. In this regard, Pemrick argues that it defies common sense to believe that SUNY–DMC considered her a "temporary" employee, because their affiliation lasted more than ten years.

■ Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000e(f) (1994). The use of this term contemplates "the conventional master-servant relationship as understood by common-law agency doctrine." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). The Second Circuit has stated that whether someone is an employee entitled to the protections of Title VII usually turns on whether that person has received "direct or indirect remuneration" from the supposed employer. *See O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir.1997), *cert. denied*, 522 U.S. 1114, 118 S.Ct. 1048, 140 L.Ed.2d 112 (1998).

The Second Circuit recently held that "an employment relationship within the scope of Title VII can exist even when the putative employee receives no salary so long as he or she gets numerous job-related benefits." *Pietras v. Board of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir.1999). In *Pietras*, the court of appeals held that a probationary volunteer firefighter, who received no salary or benefits from the Board of Fire Commissioners—her alleged "employer"—but rather received benefits under state law, nevertheless was an "employee" for Title VII purposes, and therefore, the Board of Fire Commissioners was her employer under Title VII. *Id.* Thus, where a so-called volunteer receives significant job-related benefits—even if those benefits are not obtained directly from the alleged employer—at the very least a fact question is created regarding the employment relationship. *Id.*

The defendants' motion for summary judgment on the basis that SUNY–DMC was not plaintiff's employer cannot be granted on the strength of this case. Un-der *Pietras*, at the very least a question of fact would arise regarding the employment relationship between Pemrick and SUNY–DMC. Some of these issues of material fact are genuine, such as those regarding the tangible and intangible benefits received both by SUNY–DMC and by Pemrick as a result of their decade-long association. For example, Pemrick points out that SUNY–DMC, as her host research institution, received direct financial benefits as a result of her receipt of grants. Moreover, common sense dictates that SUNY–DMC benefitted, materially or otherwise, from having significant sums of grant monies awarded to Pemrick as an Assistant Professor at SUNY–DMC (albeit a "voluntary" and "temporary" one). Thus, the Court cannot say as a matter of law that no employment relationship existed between SUNY–DMC and Pemrick.

Defendants cite two other cases in support of their position, both of which are distinguishable, and which have been significantly weakened in light of *Pietras*. First, defendants cite *O'Connor v. Davis*, 126 F.3d 112 (2d Cir.1997), in support of the argument that Pemrick, as a volunteer, had no employment relationship with SUNY–DMC. In *O'Connor*, the plaintiff was a student at Marymount College and was required, as part of her social work major, to perform field work in the form of internships at college-approved locations. *O'Connor*, 126 F.3d at 113. During her internship at Rockland Psychiatric Center, O'Connor alleged that she was sexually harassed by a physician employed by Rockland. *Id.* at 113–14. Although O'Connor complained to staff at Rockland, and later to her Marymount advisor, the harassment was slow to be remedied. *Id.* Eventually, O'Connor left Rockland, completed her internship elsewhere, and then brought suit against the harassing physician, Marymount College, Rockland Psychiatric Center, and the State of New York. *Id.* at 114.

After the physician and Marymount College were dismissed from the suit, Rock-

land Psychiatric Center and the State of New York moved for summary judgment on the grounds that O'Connor was not an employee of either Rockland or the State under Title VII. *Id.* The district court agreed and granted the motion. *Id.* On appeal, the Second Circuit affirmed, holding that the question of the plaintiff's "hiring" by the defendants was dispositive of the claim. *Id.* at 115. The court reasoned that in the absence of a "hiring" or of some sort of economic benefit, no employment relationship existed. *Id.* at 115–16. The court held that in "the absence of either direct or indirect economic remuneration or the promise thereof," O'Connor was not a Rockland employee under Title VII. *Id.* at 116.

Here, of course, there is a significant question of fact regarding whether Pemrick was "hired" by SUNY–DMC, whether she and/or SUNY–DMC received direct or indirect economic remuneration as a result of their relationship, and in light of Stracher's alleged promise to obtain a state-funded position for Pemrick, whether there was "a promise" of remuneration. None of these issues was present in *O'Connor.* Therefore, summary judgment cannot be granted on the basis of this case.

Defendants' reliance on *Tadros v. Coleman*, 898 F.2d 10 (2d Cir.1990), is similarly misplaced. Plaintiff Makram A. Tadros was a volunteer faculty member at Cornell University Medical College. *Tadros v. Coleman*, 717 F.Supp. 996, 998 (S.D.N.Y. 1989). He received no salary, had no teaching assignments, no research laboratory, no library privileges, no campus office, and received no fringe benefits of any kind from Cornell. *Id.* Tadros obtained his position simply by asking for it. *Id.* The district court found, essentially, that Tadros' position at Cornell was nothing more than a paper position, an honor without meaning. *Id.* at 1005, 1006 n. 17. As a result of the lack of any indicia of an employment relationship, the district court granted Cornell's motion for summary judgment on the grounds that Tadros was

not an employee of the institution. *Id.* at 1006. The court of appeals affirmed on similar grounds. *Tadros v. Coleman*, 898 F.2d at 11.

The facts of the present case are distinct from those that were presented to the *Tadros* courts. For example, material issues remain regarding how Pemrick arrived (or was lured) to SUNY–DMC; the economic relationship between Pemrick and the institution; and other issues indicative of an employment relationship, such as those surrounding SUNY–DMC's investigation into Pemrick's harassment complaints and the agreement executed by the parties. *See* nn. 8 & 9, *supra.* Summary judgment cannot be granted to the defendants on the strength of the *Tadros* case.

■ For her part, Pemrick argues that SUNY–DMC and the Research Foundation of SUNY are so intertwined that they are in effect one and the same. Pemrick contends that the Court should treat SUNY–DMC and the Research Foundation of SUNY as joint or integrated employers, and that both should be held liable for any violation of Title VII or the ADEA.

■ Separate corporate entities may be sufficiently interrelated such that they may be considered joint or integrated employers under Title VII. *See Campbell v. City Univ. Constr. Fund*, No. 98 Civ. 5463, 1999 WL 435132, at *3 (S.D.N.Y. June 25, 1999); *Sowemimo v. D.A.O.R. Security, Inc.*, 43 F.Supp.2d 477, 490 (S.D.N.Y.1999); *Hosler v. Greene*, 5 F.Supp.2d 99, 101 (S.D.N.Y.1998); *Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522, 529 (S.D.N.Y.1998); *Fox v. City Univ. of New York*, No. 94 CIV. 4398, 1996 WL 384915, at *4–7 (S.D.N.Y. July 10, 1996). "Where it appears that more than one entity is involved in controlling an individual's employment situation, courts have recognized the concept of multiple 'employers' under 42 U.S.C. § 2000e." *Fox*, 1996 WL 384915, at *4. The determination of whether different entities are "joint" or "integrated" employers is made by analyzing "(1) interrelation

of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Campbell,* 1999 WL 435132, at *3 (citing *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995)).

The Research Foundation of the State University of New York was incorporated in 1951. Dennehey Aff., ¶ 3. Its main purposes, as outlined in its corporate charter, are to "receive, hold and administer gifts or grants" and to "finance the conduct of studies and research in any and all fields of the arts and sciences, of benefit to and in keeping with the educational purposes and objects of State ·University of New York." Exh. MOL–# 4. The Chancellor of SUNY is a director ex-officio and serves as Chair of the Board of Directors of the Research Foundation of SUNY. *Id.* The directors of the corporation and their successors are elected by the trustees of the State University of New York. *Id.* The Research Foundation of SUNY's principal office is located in Albany. *Id.* Moreover, the Research Foundation of SUNY maintains "most" of its 9000 employees "at campuses of the State University of New York, or at off-site locations." Dennehey Aff., ¶ 4. The employees of the Research Foundation of SUNY work on research projects "under the direction of Project Directors who are generally research faculty employed at the State University of New York." *Id.* The Commissioner of Education of the State of New York is designated in the charter as the representative of the corporation upon whom process in any action or proceeding against it may be served. Exh. MOL–# 4.

Pursuant to a copy of a 1977 contract submitted by the plaintiff, the Research Foundation of SUNY administers *all* grants received by scientific investigators affiliated with SUNY. Exh. MOL–# 5. The contract between SUNY and the Research Foundation of SUNY make it clear that both parties

> recognize that inasmuch as a portion of the Foundation's income is attributable to the use of University facilities and personnel, and *since the Foundation's sole purpose is to serve the University,* any income of the Foundation in excess of the amount necessary to meet its own operating expenses and the maintenance of appropriate and prudent reserve funds should be expended for the benefit of the University....

*Id.* (emphasis added).

The contract additionally recognizes explicitly that "the University and the Foundation have continued to work together in harmony and have developed various procedures, understanding and working relationships to facilitate the conduct of sponsored programs." *Id.* As far as grant money goes, the agreement acknowledges that

> most grants ... are initiated by proposals by faculty members at the State-operated institutions of the University detailing the scope, objectives, staffing and budget of the proposed sponsored program, which are then incorporated into formal applications to the sponsor by the University and the Foundation [and that] such awards are made to the Foundation for and in conjunction with the University....

*Id.*

The language of this agreement, together with the Research Foundation of SUNY's corporate charter and the other evidence proffered by the plaintiff, make it abundantly clear that the defendant State University of New York and the Research Foundation of SUNY are inseparable in terms of their mission and their money. The Research Foundation of SUNY does not exist but for SUNY, and no research grants flow to SUNY except through the Research Foundation of SUNY. Defendants admit that the employees of the Research Foundation of SUNY operate under the direction and control of SUNY faculty members. Dennehey Aff., ¶ 4. Under the facts in this record, the Court has no hesitancy in declaring that SUNY and

the Research Foundation of SUNY are joint, integrated employers for purposes of Title VII, and that both are properly deemed Pemrick's employer for the purposes of this action.

■ Finally, and most importantly, there is another significant issue regarding the parties' employment relationship. As noted previously, this case originally was filed in the Northern District of New York in 1990. The original defendants were Stracher and Schwarz, and the original cause of action was only age discrimination. Before Stracher and Schwarz answered the complaint, Plaintiff amended the complaint to add SUNY–DMC and the State University of New York as defendants and to add a claim of sex discrimination. Following this amendment, the defendants moved to transfer this case to the Eastern District of New York, primarily for reasons of convenience to the defendants.

In support of their motion to transfer venue, the defendants relied upon the argument that "since this case involves a dispute arising from plaintiff's employment at Downstate in Brooklyn," it made much more sense to litigate the case in Brooklyn than in Albany. *See* Memorandum of Law in Support of Defendants' Motion to Transfer Venue, dated December 17, 1991, at 11. Defendants also argued that

> [h]ere, the material events occurred at the place of employment—Downstate Medical Center: plaintiff commenced work at Downstate in 1978 after her former position in New York City terminated; she worked at Downstate in Brooklyn for ten years; the working relationships were formed in Brooklyn; plaintiff applied for the positions at issue in Brooklyn; her application was reviewed in Brooklyn; the allegedly discriminatory conduct occurred in Brooklyn by those charged with making the employment decision; and the position plaintiff sought is located in Brooklyn.

*Id.* at 16. Finally, in a February 20, 1991 affidavit signed by defendants' then-coun-

sel, the defendants essentially admitted that SUNY–DMC was Pemrick's employer. This affidavit was filed in opposition to the plaintiff's motion to amend the complaint and to reconsider the order that transferred venue to the Eastern District of New York. The affidavit was signed Darren O'Connor, Esq., at the time an Assistant Attorney General, who stated that "as the complaint indicates, the relevant 'employer' here was SUNY Brooklyn, not the statewide State University of New York." Affidavit of Darren O'Connor, February 20, 1991, ¶ 7.

It is clear that, in 1991, this argument was persuasive. The magistrate judge who ruled on the motion indicated that "the events which led to this complaint occurred while plaintiff was employed at Downstate. Plaintiff worked and resided in Brooklyn for ten years." Memorandum–Decision and Order of U.S. Magistrate Judge Ralph W. Smith, Jr., dated February 21, 1992, at 3–4.

Considering these circumstances, the Court cannot, in equity and good conscience, allow the defendants to take such contrary positions during the course of litigation. In other words, if SUNY–DMC was Pemrick's employer in 1991 when the defendants moved to transfer venue, then SUNY–DMC was Pemrick's employer in 1999 when the defendants' summary judgment motion was made. While the Court might excuse the defendants' use of the words "employment" and "employer" in their prior submissions as merely inartful, it is the Court's view that these statements are admissions—positions and arguments that were used deliberately by the defendants in a prior stage of the litigation, and used with success in having this action transferred to this district.

As a result, defendants' motion for summary judgment on the ground that SUNY–DMC was not plaintiff's employer must be denied. The "pleadings ... and admissions on file, together with the affi-

davits," demonstrate the contrary. *See* Fed.R.Civ.P. 56(c).

## II. Plaintiff's Prima Facie Case

■ To establish a prima facie case of discrimination because of sex or age, a plaintiff must establish that (1) she belongs to a protected class; (2) she applied for a specific position with the defendant; (3) she was qualified for the position; and (4) despite her qualifications, the position was given to a member of an unprotected class under circumstances that give rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Belfi v. Prendergast*, 191 F.3d 129, 138 (2d Cir.1999) (reciting factors required to make out a prima facie case of employment discrimination in violation of Title VII). Defendants do not seriously dispute items (1), (2) or (4).[12] Rather, they claim that Pemrick was not qualified for the position because of her lack of a specialty in molecular biology.

The essence of the defendants's position is that they were seeking a molecular biologist to fill the empty position at SUNY–DMC, and that Pemrick was not qualified because she shared a specialty with Stracher in muscle structural biology, and therefore there was no position available for her. Pemrick argues that she was qualified and that much of her work did in fact deal with molecular biology.

There are genuine issues of material fact regarding this claim. First, defendants have not submitted any evidence that Pemrick would not be considered by scientists to be a molecular biologist, or that she does not have a specialty in molecular biology.[13] Second, the first person to whom the job was offered, Dr. Nancy Carrasco, did not have a Ph.D., but rather had a medical doctor degree from a foreign university. Other than Stracher's opinion expressed in an affidavit, there is no evidence that Carrasco was a specialist in molecular biology. Nor is there any evidence that the second offeree, Dr. Lakshmi Devi, was a molecular biologist. It is axiomatic that the movant has the burden to establish the absence of any genuine issue of material fact in order to obtain summary judgment. *Blackwood Assoc.*, 153 F.3d at 67. This burden has not been met here.

Plaintiff, however, has produced evidence in the form of letters to her from other research institutions indicating surprise that a person of Pemrick's qualifications and research experience had not yet obtained a tenure-track position at SUNY–DMC after such a long period of time with the institution. While not direct evidence that Pemrick was qualified as a molecular biologist, these letters nevertheless indicate that Pemrick was a qualified research scientist. Moreover, defendants admit that Pemrick was interviewed for the position during the second search on the recommendation of SUNY–DMC's affirmative action officer. The admission that Pemrick received an interview for the position considerably weakens the defendants' argument that she was not qualified for the position. It stretches the imagination to

---

12. Defendants make a weak argument that while Pemrick applied for Dr. Kirschenbaum's open position during the first two searches, she did not apply for the position during the third search. This argument has no merit in light of the fact that plaintiff had been drawn to SUNY–DMC initially on the promise of a tenure-track position, and that she had been applying for a state line at SUNY–DMC for approximately eight years by the time the third search was conducted.

13. This evidence likely would have to come via expert testimony from someone familiar with the fields of biochemistry and molecular biology. Given the specialized fields of research science at issue here, the Court is not competent to decide these issues in the absence of such evidence. *See generally* Fed. R.Evid. 702. While defendant Stracher has submitted an affidavit stating that Pemrick was not a molecular biologist, Pemrick claims that she was. This difference of opinion as to plaintiff's qualifications highlights the existence of a material issue of fact on this claim.

believe that if plaintiff were not qualified for the job, the defendants nevertheless would have gone to the trouble to consider her application and grant her an interview.

Additionally, Pemrick claims that the argument that she was not qualified in molecular biology is a ruse because, she alleges, Stracher continually changed the criteria for the position. Pemrick claims that every time she applied for the position, the searches were canceled and the position was re-engineered to one for which an argument could be made that she was not qualified. Moreover, plaintiff claims that SUNY–DMC did not follow institution rules for posting of available positions, resulting in her finding out "through the grapevine" that searches had been re-opened.[14]

Therefore, the existence of several genuine issues of material fact preclude granting summary judgment to defendants on this basis. There is evidence in the record which, if believed by a jury, would establish that Pemrick was qualified for the positions for which she applied, or that the defendants purposefully and unlawfully engineered a scheme to prevent Pemrick from obtaining a tenure-track position at SUNY–DMC.

III. DMC's Alleged Reliance on Separation Agreement

Defendants also argue that even if plaintiff makes out a prima facie case for employment discrimination, they had legitimate non-discriminatory reasons for not hiring her. Toward the end of 1987, when it was becoming clear that the relationship between Pemrick and the defendants was deteriorating, SUNY–DMC and Pemrick entered into an agreement providing for,

among other things, Pemrick's resignation. The agreement required Pemrick to execute two post-dated letters of resignation, dated August 31, 1988 and August 31, 1989. Because Pemrick had a grant renewal application pending at the time the agreement was executed, the parties agreed that if the grant were renewed, SUNY–DMC would destroy the earlier of the two letters, but hold Pemrick to the later. However, if the grant renewal were denied, Pemrick would resign pursuant to the letter dated August 31, 1988.

In addition to this agreement, which Pemrick claims SUNY–DMC had no intention of obeying and breached almost immediately, the parties executed general releases. The releases were standard releases, providing that each party would hold the other harmless for any and all claims. Defendants claim that the explicit purpose of the agreement was to end Pemrick's association with SUNY–DMC and to aid her in obtaining a position at another institution. Defendants argue that they were entitled to rely on this agreement when considering whether or not Pemrick would be considered for the position left vacant by Dr. Kirschenbaum's passing.

This argument has no merit. While SUNY–DMC may have relied on the releases to protect themselves from any *prior* claims Pemrick may have had (an argument not presented here), there is no basis to argue that the agreement somehow precluded Pemrick from re-applying for the position formerly held by Dr. Kirschenbaum, or any other position at SUNY–DMC. Nor would the agreement, even if valid, prospectively relieve defendants from complying with the mandates of Title

14. Moreover, in January 1988—three months prior to the time that defendants offered the position previously occupied by Dr. Kirschenbaum to Dr. Gick—SUNY–DMC published an advertisement in the journal Cell that it was accepting applications to fill fifteen (15) new faculty positions in the "general area of Molecular and Cellular Biology." These positions were to be filled in the Department of Anatomy and Cell Biology, the Department of Microbiology and Immunology, and the Department of Biochemistry. *See* Exh. MOL– # 13. It is unbelievable that Pemrick was not qualified for any of these fifteen open positions in these "general areas," even if she had been considered unqualified for the position that became vacant upon the death of Dr. Kirschenbaum.

VII. In fact, in his affidavit in support of the defendants' 1991 motion to transfer venue, Stracher affirmed that Pemrick "was not seriously considered" for the position during the third search. Affidavit of Alfred Stracher, dated December 17, 1991, ¶ 14. This statement reasonably could be viewed by the jury as an admission that Stracher knew that Pemrick had, in fact, applied for the position, and—given his current argument that plaintiff never applied for the position—that his proffered reason for not hiring her was pretextual. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

## IV. Plaintiff's Evidence of Intentional Discrimination

 Defendants also argue that even if Pemrick sets forth a prima facie case of discrimination, she has no evidence that any defendant intentionally discriminated against her. It is true, as defendants submit, that the plaintiff retains the "ultimate burden of persuading the trier of fact that [s]he has been the victim of intentional discrimination." *Hicks,* 509 U.S. at 508, 113 S.Ct. 2742 (internal brackets omitted) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). However, "[d]irect evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence." *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir. 1997). Additionally, the issue of intent usually is a jury question. *See id.* at 215–16; *see also Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir.1997); *Cornwell v. Robinson,* 23 F.3d 694, 706 (2d Cir.1994). Finally, it is axiomatic that a court may not decide issues of fact on a motion for summary judgment, but rather must decide whether genuine issues of material fact exist. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64–65 (2d Cir.1995) ("[i]n deciding a motion for summary judgment, when confronted with facts from which several differing conclusions may be drawn, the inferences drawn from such underlying facts are viewed in the light most favorable to the non-movant.").

Drawing every reasonable inference in favor of Pemrick, the non-movant, the Court holds that on this record, there is sufficient evidence that, if believed by a trier of fact, would support a conclusion that plaintiff was intentionally discriminated against on the basis of her gender. Thus, summary judgment cannot be granted to the defendants on this basis.

On the other hand, the Court finds little evidence in the record that Pemrick has suffered any discrimination on the basis of her age. At oral argument, in response to a question by the Court regarding evidence of age discrimination, plaintiff stated that

> my age discrimination evidence is that the position that I was applying for was an assistant professor of biochemistry and I went through for about a 20–year period all people who were appointed to that rank is, and I asked their age at appointment and they were all—I believe it's in my affidavit, within—I did an average for decades, like maybe the 1970s and 1980s and it was all within a range that was under the age of 35 when they had appointment to the tenure track and most—a vast majority of them obtained tenure prior to the age of 40. Here I was, I think with my first application, 45, seeking a tenure track appointment at that rank, assistant professor.

Secondly, in a letter of Dr. Stracher dated July of 1984, he says in this letter to Dr. Schwartz [sic] the dean regarding his expectations from me to be appointed to a tenure track position, ... that he had different expectations from someone

who was senior and I think the letter implied I was senior. . . . He said he didn't want to make a senior appointment as one of the reasons for my non-selection, the implication that I had become senior.

\*\*\*\*

Also, when I wanted to take a sabbatical, I was told by the dean of the graduate school that he thought I had possibly become too old for retraining, and I took that as age discrimination, because I was seeking an application for a research fellowship for retraining.

Transcript of Oral Argument, July 9, 1999, at 29–30. Pemrick also stated that over the years she was subjected to demeaning comments about her age. For instance, Pemrick argued that at least once a member of the biochemistry department walked up to her in front of other people, asked her how old she was, said that she had a double chin, and asked her if she was getting hot flashes. *Id.* at 30.

Although it is a very close question, the Court denies the defendants' motion for summary judgment on the ADEA claim. First, the Court recognizes that many of these cases turn on the very sort of comments that plaintiff claims were made to her in relation to being too old for retraining; Stracher's not wanting to make a "senior" appointment; and offensive comments about double chins and hot flashes. Second, these comments as alleged tend to impact directly on the plaintiff's working environment and chances for promotion and/or hiring. Third, the Court finds that this evidence, if believed by a factfinder, could constitute unlawful discrimination on the basis of plaintiff's age. Finally, it is

axiomatic that on a motion for summary judgment, the Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Castle Rock*, 150 F.3d at 137.

Thus, having found that there is more than a "metaphysical doubt as to the material facts" of this claim of age discrimination, *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348, the Court denies defendants' motion for summary judgment on this claim.

## V. Dismissal of Stracher and Schwarz in Official Capacities

 Defendants move for summary judgment as to Stracher and Schwarz, arguing that individuals may not be held liable for Title VII or ADEA violations.[15] *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995). Defendants are correct. *See Hussein v. Hotel Employees and Restaurant Union Local 6*, No. 98 Civ. 9017, 1999 WL 767429, at \*4 (S.D.N.Y. Sept.28, 1999). The fact that Stracher and Schwarz are sued only in their official capacities is irrelevant, since Title VII and the ADEA do not authorize such "official capacity" suits. *See id.* (citing cases); *see also Coddington v. Adelphi Univ.*, 45 F.Supp.2d 211, 217 (E.D.N.Y.1999) (noting that official capacity claims under Title VII are an inappropriate outgrowth from civil rights lawsuits against government officials).

The result is the same in this case, even where the plaintiff seeks not only money damages but also injunctive relief. *See Tomka*, 66 F.3d at 1314 (noting the congressional concern with the high costs of litigating discrimination claims); *see also Coddington*, 45 F.Supp.2d at 217 (noting

---

**15.** The statutory definition of "employer" under the ADEA is almost identical to that found in Title VII. *Compare* 29 U.S.C. § 630(b) *with* 42 U.S.C. § 2000e(b). Courts, for compelling reasons, analyze claims brought pursuant to the ADEA in a manner similar to those brought pursuant to Title VII. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997); *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1279–80 (7th Cir.

1995). While the Second Circuit has not ruled on this issue in a published opinion, other circuits have held that individuals are not liable under the ADEA. *Smith v. Lomax*, 45 F.3d 402, 403–04 & n. 4 (11th Cir.1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir.1994); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587–88 (9th Cir. 1993).

that individual employees of the employer-entity need not remain as defendants simply because they may be required to implement an injunctive-type order entered against the employer). Thus, the Court holds that *Tomka*'s individual liability bar applies to individual defendants in their official capacities, as well as to situations where the plaintiff seeks prospective injunctive relief against such individuals, under both Title VII and the ADEA. *See Tomka,* 66 F.3d at 1314 ("equitable remedies ... are most appropriately provided by employers, defined in the traditional sense of the word.").

As a result, summary judgment is granted to Stracher and Schwarz, and all claims against these two individual defendants are dismissed with prejudice.

VI. Court's Jurisdiction to Consider Claims not Raised in Administrative Filing

 As a general proposition, a plaintiff's claims that are not set forth explicitly in an EEOC charge, but which are reasonably related to claims made in the charge, may be set forth in a subsequent action in federal court. *Butts v. City of New York Dep't of Hous. Preservation and Dev.,* 990 F.2d 1397, 1402 (2d Cir.1993). "Reasonably related" means that despite the claimant's having failed to specify the precise charge, the EEOC likely would have investigated the conduct complained of anyway. *Id.*

The Court has no doubt that Pemrick's claims that (1) she impermissibly was terminated from employment in 1990 and (2) that defendants used impermissible criteria in failing to promote her, are reasonably related to the claims made in the EEOC charge.[16] Given the nature of the alleged behavior of the defendants, it is

highly likely that the EEOC would have investigated the conduct involved in these two claims, despite plaintiff's failure to specify them in her EEOC charge.

Therefore, the defendants' motion for summary judgment on these two claims is denied.

### CONCLUSION

For the reasons discussed above, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part. All claim against individual defendants Alfred Stracher and Richard Schwarz are DISMISSED with prejudice.

The final pre-trial conference is set for Friday, December 10, 1999 at 10:30 a.m. The jury will be selected on February 7, 2000, and this case will move to trial immediately thereafter.

SO ORDERED.

---

16. Plaintiff also argues that as a result of her disaffiliation with SUNY–HSCB, expensive laboratory equipment that she had purchased with grant proceeds improperly was withheld from her or damaged by the defendants, and that the defendants are liable for any damage or harm to that equipment. Although this claim is not set forth explicitly in the amended complaint, upon proper application the Court would consider a motion by the plaintiff for leave to amend the complaint to assert a pendent state law claim for conversion, trespass to chattels, and/or replevin.